IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| VICTOR M. BOOTH,<br>    individually and as next friend of<br>    L.B. a minor child; | ) ) ) ) | |
| SHAMEKA WILLIAMS,<br>    individually and as next friend of<br>    K.G. and R.T., minor children; | ) ) ) ) | |
| SHANITA WILLIAMS,<br>    individually and as next friend of<br>    N.W. and M.R., minor children; and | ) ) ) | **Case No. 21-1857** |
| JANE HELLEWELL,<br>    individually and as next friend of<br>    H.B., a minor child,<br>                            *Plaintiffs*,<br>*vs.* | ) ) ) ) ) ) | **PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**21-DAY EMERGENCY HEARING REQUESTED** |
| MURIEL BOWSER,<br>    in her official capacity as Mayor of the<br>    District of Columbia; | ) ) ) ) | |
| LAQUANDRA NESBITT,<br>    In her official capacity as<br>    Director of the District of Columbia<br>    Department of Health; and | ) ) ) ) ) | |
| LEWIS FEREBEE,<br>    In his official capacity as<br>    Chancellor of the District of Columbia<br>    Public Schools,<br>                          *Defendants*. | ) ) ) ) ) | |

_____

# TABLE OF CONTENTS

**Page #**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS .................................................................................... 2

ARGUMENT ......................................................................................................... 8

    I.      PLAINTIFFS' LEGAL CHALLENGES TO THE MINOR CONSENT
           ACT ARE LIKELY TO SUCCEED ON THE MERITS. ..................................... 8

           A.     *The Minor Consent Act directly violates multiple statutory
                  requirements of the National Childhood Vaccine Injury Act of 1986.* ....... 9

                  1.     The National Vaccine Act's comprehensive regulatory
                          framework for litigating vaccine injuries depends on the
                          accurate recording and reporting of information specified by
                          Congress. ................................................................................. 10

                  2.     The Minor Consent Act violates 42 U.S.C. § 300aa-26. ............. 12

                  3.     The Minor Consent Act violates 42 U.S.C. § 300aa-25(a). .......... 15

                  4.     The Minor Consent Act violates 42 U.S.C. § 300aa-25(b). .......... 17

                  5.     The Minor Consent Act violates 42 U.S.C. § 300aa-25(c). .......... 18

            B.     *The Minor Consent Act substantially burdens Plaintiffs'
                  fundamental right to freely exercise religion in violation of the
                    Religious Freedom Restoration Act.* ......................................................... 21

                  1.     The Minor Consent Act substantially burdens Plaintiffs'
                          right to free exercise of religion. ................................................ 21

                  2.     The District does not have a compelling government interest
                        in offering parents a religious exemption with one hand, and
                        then stripping them of that exemption's protections with the
                        other. ......................................................................................... 24

                  3.     The Minor Consent Act is not narrowly tailored. ........................ 27

            C.     *The Minor Consent Act violates the free exercise clause of the First
                  Amendment.* ............................................................................................. 28

i

       D.     *The Minor Consent Act deprives Plaintiffs of their fundamental rights to direct the medical care of their children, in violation of the due process clause of the Fifth Amendment* ............................................... 29

             1.     The Minor Consent Act makes no attempt to rebut the presumption that fit parents act in the best interests of their children. ...................................................................................... 31

             2.     The Minor Consent Act does not give special weight to the decisions of fit parents. ................................................. 34

             3.     The Minor Consent Act is not narrowly tailored to further a compelling state interest. ............................................. 34

II.     WITHOUT INJUNCTIVE RELIEF, PLAINTIFFS WILL BE IRREPARABLY HARMED. ............................................................... 35

       A.     *The deprivation of statutory and constitutional rights is an irreparable injury.* ...................................................................... 36

       B.     *The District's threat to the constitutional rights of Plaintiffs is imminent.* ............................................................................... 37

III.    INJUNCTIVE RELIEF WILL FURTHER THE PUBLIC INTEREST .............. 39

CONCLUSION .................................................................................................. 40

## TABLE OF AUTHORITIES

**Federal Cases**

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ................................................................................................35

*Apotex, Inc. v. FDA*,
2006 U.S. Dist. LEXIS 20894 (D.D.C. Apr. 19, 2006) (UNPUBLISHED),
*aff'd, Apotex, Inc. v. FDA*, 449 F.3d 1249 (D.C. Cir. 2006)....................................................36

*Arizona v. United States*,
567 U.S. 387 (2012)..................................................................................................................10

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011)....................................................................................................10, 11, 14

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)....................................................................................................21, 22, 25, 27

*C.f. B.W.C. v. Williams*,
990 F.3d 614 (8th Cir. 2021) ...................................................................................................23

*Cantwell v. Connecticut*,
310 U.S. 296 (1940)..................................................................................................................28

*Capitol Hill Baptist Church v. Bowser*,
496 F. Supp. 3d 284 (D.D.C. 2020) ...........................................................................22, 25, 36, 40

*Carey v. Population Services International*,
431 U.S. 678 (1997)..................................................................................................................35

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ...................................................................................................8

*CityFed Fin. Corp. v. Office of Thrift Supervision, United States Dep't of Treasury*,
58 F.3d 738 (D.C. Cir. 1995) ...................................................................................................37

*Cleveland Bd. of Educ. v. LaFleur*,
414 U.S. 632 (1974)..................................................................................................................30

*Cruzan v. Dir., Missouri Dep't of Health*,
497 U.S. 261 (1990)..................................................................................................................30

*De Nolasco v. United States Immigration & Customs Enforcement*,
319 F. Supp. 3d 491 (D.D.C. 2018) .....................................................................................33, 35

*Department of Agriculture v. Moreno,*
    413 U.S. 528 (1973) ...........................................................................................27

*Doe v. Bolton,*
    410 U.S. 179 (1973) ...........................................................................................35

*Doe v. Zucker,*
    496 F. Supp. 3d 744 (N.D. N.Y. 2020) ..........................................................23, 30

*Elrod v. Burns,*
    427 U.S. 347 (1976) ......................................................................................36, 38

*Employment Div. v. Smith,*
    494 U.S. 872 (1990) ...........................................................................................22

*Franz v. United States,*
    707 F.2d 582 (D.C. Cir. 1983) ..........................................................................35

*Freightliner Corp. v. Myrick,*
    514 U.S. 280 (1995) ...........................................................................................11

*Fulton v. City of Philadelphia,*
    ___ U.S. ___, 2021 U.S. LEXIS 3121 (2021) ....................................................24

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ......................................................................................24, 25

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ..........................................................................39

*Green v. Bock Laundry Mach. Co.,*
    490 U.S. 504 (1989) ...........................................................................................12

*Hernandez v. Commissioner,*
    490 U.S. 680 (1989) ...........................................................................................22

*Hi-Tech Pharmacal Co. v. United States FDA,*
    587 F. Supp. 2d 1 (D.D.C. 2008) ....................................................................36, 37

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ......................................................................................24, 27

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ..................................................................................25, 26, 27

*Jones v. Rath Packing Co.,*
    430 U.S. 519 (1977) .............................................................................................9

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C. Cir. 2008) ...................................................................22, 23

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..........................................................8, 35, 37, 39

*Lopez v. Davis*,
531 U.S. 230 (2001) .................................................................................12

*Mann v. Cty. Of San Diego*,
907 F.3d 1154 (9th Cir. 2018) ...................................................................32

*Masterpiece Cakeshop, LTD., v. Colorado Civil Rights Commission*
138 S. Ct. 1719 (2018) ............................................................................29

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) ..................................................................35

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) ........................................................36, 37, 38

*Mills v. District of Columbia*,
584 F. Supp. 2d 47 (D.D.C. 2008) ..........................................................37, 38

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................39

*Oneok, Inc. v. Learjet, Inc.*,
135 S. Ct. 1591 (2015) ..............................................................................9

*Parham v. J.R.*,
442 U.S. 584 (1979) .................................................................................31

*PLIVA, Inc. v. Mensing*,
564 U.S. 604 (2011) .........................................................................9, 11, 12

*Population Institute v. McPherson*,
797 F.2d 1062 (D.C. Cir. 1986) ...............................................................8, 37

*Prince v. Massachusetts*,
421 U.S. 158 (1944) .................................................................................30

*Pursuing America's Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2009) ....................................................................8

*Quillion v. Walcott*,
434 U.S. 246 (1978) .................................................................................33

*Roberts v. Neace*,
    958 F.3d 409 (6th Cir. 2020) (*per curiam*) ..........................................................................40

*Romer v. Evans*,
    517 U.S. 620 (1996)..........................................................................27

*Santosky v. Kramer*,
    455 U.S. 745 (1982)..........................................................................30

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)..........................................................................9

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ..........................................................................8

*Shuttlesworth v. Birmingham*,
    394 U.S. 147 (1969)..........................................................................28

*Sickle v. Torres Advanced Enter. Sols., LLC*,
    884 F.3d 338 (D.C. Cir. 2018) ..........................................................................9, 10, 18

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*,
    450 U.S. 707 (1981)..........................................................................22

*Troxel v. Granville*,
    530 U.S. 57 (2000)..........................................................................29, 30, 31, 33, 34

*Tyndale House Publishers, Inc. v. Sebelius*,
    904 F. Supp. 2d 106 (D.D.C. 2012) ..........................................................................36, 40

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000)..........................................................................27

*Van Emrik v. Chemung County Dep't of Social Servs.*,
    911 F.2d 863 (2d Cir. 1990)..........................................................................32

*Wagner v. Taylor*,
    836 F.2d 566 (D.C. Cir. 1987) ..........................................................................37

*Wallis ex rel. Wallis v. Spencer*,
    202 F.3d 1126 (9th Cir. 1999) ..........................................................................32

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) ..........................................................................8

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)..........................................................................34

*Washington v. Harper,*
   494 U.S. 210 (1990) ............................................................................................31

*West Virginia Bd. of Ed. v. Barnette,*
   319 U. S. 624 (1943) ...........................................................................................22

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008) ...................................................................................8, 37, 39

*Wisconsin Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ..........................................................................35

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ...........................................................................................30

## United States Constitution

Article VI .................................................................................................................1
Article VI, cl. 2 .......................................................................................................9
First Amendment .......................................................................................... 1, *passim*
Fourth Amendment ...............................................................................................37
Fifth Amendment ......................................................................................... 1, *passim*
Fourteenth Amendment ........................................................................................30

## Federal Statutes

21 U.S.C.
   § 360bbb-3(e)(1)(A)(ii)(1-111) .........................................................................19

42 U.S.C.
   § 247 ...................................................................................................................19
   § 300aa-25 .....................................................................................................11, 18
   § 300aa-25(a) ...............................................................................15, 16, 17, 29
   § 300aa-25(b) .....................................................................................................17
   § 300aa-25(c) .....................................................................................................18
   § 300aa-26 ...............................................................................................11, 12, 18
   § 300aa-26(a) ...............................................................................................11, 12
   § 300aa-26(b) .....................................................................................................13
   § 300aa-26(c) ...............................................................................................12, 13
   § 300aa-26(d) .......................................................................................12, 13, 31
   § 300aa-33(2) ...............................................................................................12, 16
   § 2000bb(a)(2)-(3) .............................................................................................21
   § 2000bb-1(b) ...............................................................................................21, 24
   § 2000bb-1(c) .....................................................................................................21
   § 2000bb-2 .........................................................................................................21
   § 2000bb-2(4) .....................................................................................................21
   § 2000cc-5(7) .....................................................................................................21

**State Statutes**

D.C. Code
§ 38-202(a)....................................................................................................3
§ 38-501..........................................................................................................3
§ 38-502.....................................................................................................3, 28
§ 38-503..........................................................................................................3
§ 38-506..........................................................................................................3
§ 38-506(1).................................................................................3, 23, 28, 32
§ 38-602(a)(2).........................................................................................33, 34
§ 38-602(b)(2).............................................................................................28

**District of Columbia Municipal Regulations**

Title 22-B ..................................................................................................1, 2
§ 600.9.........................................................................................................15
§ 600.9(a)...............................................................................................27, 34

**Internet Citations**

*Countermeasures Injury Compensation Program (CICP)*, HEALTH RESOURCES
AND SERVICES ADMINISTRATION, https://www.hrsa.gov/cicp ..................................20

*COVID-19 Response Protocol FAQ*, #REOPENSTRONG,
https://dcpsreopenstrong.com/health/response/ ..........................................4

*Vaccines and Related Biological Products Advisory Committee Meeting October
26, 2021, FDA Briefing Document, EUA amendment for Pfizer-BioNTech
COVID-19 Vaccine for use in children 5 through 11 years of age*, FDA.GOV,
https://www.fda.gov/media/153447/download....................................................19

*What is Alternative*, THE LAW DICTIONARY (2021), *available at*
https://thelawdictionary.org/alternative/ (accessed July 5, 2021)..........................13

*What is Supplemental*, THE LAW DICTIONARY (2021), *available at*
https://thelawdictionary.org/supplemental/ (accessed July 5, 2021) .......................13

**Other Authorities**

Pfizer-BioNTech COVID-19 vaccine Fact Sheet ....................................................20

## PRELIMINARY STATEMENT

The plaintiffs are the parents of minor children, who are students in the D.C. Public School System. The Plaintiffs' challenge the District of Columbia Minor Consent to Vaccinations Act of 2020 (hereinafter "the Minor Consent Act"), which the D.C. Council adopted on October 20, 2020, to amend Title 22-B of the District of Columbia Municipal Regulations (D.C.M.R.) to allow a child eleven years of age or older to consent to any vaccine recommended by the Advisory Committee on Immunization Practices (ACIP) without parents' knowledge or consent. The Minor Consent Act contains multiple provisions designed to deceive parents and prevent them from knowing that their child has been vaccinated without their knowledge and consent. The Minor Consent Act specifically targets the children of parents who have submitted religious exemptions. The Minor Consent Act endangers children by depriving their parents and them of the protections of the National Childhood Vaccine Injury Act of 1986 in violation of Article VI and the Fifth Amendment to the United States Constitution. The Minor Consent Act also violates the Religious Freedom Restoration Act of 1993 and the First and the Fifth Amendments to the United States Constitution.

On August 19, 2021, before the start of the school year, the Plaintiffs filed a complaint and motion for preliminary injunction. The plaintiffs' pleadings were largely based on the fears of what would happen when school reopened. On September 2, three days after school reopened, this Court held a telephonic hearing. The complaint was dismissed without prejudice. In essence, the court expressed that the case was not ripe for decision.

Consistent with Plaintiffs' predictions in the original complaint, Defendants are placing tremendous pressure on children to receive vaccines without parents' knowledge or consent. Defendants are also offering children an escape from the pressure through easily accessible walk-in vaccine clinics.  This case is now at a boiling point. One twelve-year-old child in

particular, L.B., seems likely to defy his father to get a COVID-19 vaccine, even though the vaccine violates the family's religious beliefs and may severely injure L.B.'s health. To release the unrelenting pressure on him, L.B. faces imminent harm if the court does not issue a preliminary injunction. This case is now ripe for decision.

## STATEMENT OF FACTS

The District of Columbia Minor Consent to Vaccinations Act of 2020 (hereinafter "the Minor Consent Act"), that the D.C. Council adopted on October 20, 2020, amends Title 22-B of the District of Columbia Municipal Regulations (D.C.M.R.) to allow a child who is eleven years old or older to consent to receive a vaccine recommended by the Advisory Committee on Immunization Practices (ACIP), so long as the person administering the vaccine believes the child is capable of providing informed consent, and the child provides such consent. The Act does not require the person administering the vaccine to approach the child's parent for informed consent; on the contrary, it states that medical providers who administer vaccines under the Minor Consent Act shall seek reimbursement directly from the insurer without contacting parents and that insurers shall not send an Explanation of Benefits to parents for any vaccine administered under the Act. Amended Ver. Compl. ¶ 21.

Moreover, the Act states that if a student's parent has claimed a religious exemption from vaccines in general, or an exemption from the vaccine for the Human Papillomavirus Virus vaccine (HPV) in particular, "the healthcare provider shall leave blank Part 3 of the immunization record, and submit the immunization record directly to the minor student's school." Amended Ver. Compl. ¶¶ 22-24. *See* Exhibit 1 to Amended Ver. Compl. This creates two conflicting health records for the child, one for the parents, which leaves the child's immunization record blank, even though vaccines have been administered, and the other, withheld from parents, that records the child's true history. Amended Ver. Compl. ¶¶ 25-26.

Before the adoption of the Minor Consent Act, District law gave parents two choices for immunization if they wanted to their children in public, private, or parochial school: they could either comply with immunization standards and regulations or they could obtain exemptions based on medical reasons or sincere religious beliefs. Amended Ver. Compl. ¶¶ 10-13; *see also* D.C. Code § 38-202(a); D.C. Code §§ 38-501, 38-502, 38-503, *and* 38-506. A parent may claim a religious exemption by sending a good faith objection in writing to the chief school official, stating that vaccinations violate the parent's religious beliefs. Amended Ver. Compl. ¶ 14; D.C. Code § 38-506(1). A good faith statement that a parent has sincere religious beliefs against childhood immunizations is sufficient to claim the exemption. Amended Ver. Compl. ¶ 14. The Minor Consent Act does not amend or repeal the statute, enacted in 1979. Amended Ver. Compl. ¶¶ 13, 25, 309.

Plaintiffs are four parents who live in the District, all of whom send their school-age children to D.C. Public Schools (DCPS). Amended Ver. Compl. ¶¶ 1-4. All are fit parents. Amended Ver. Compl. ¶¶ 167-170. All have claimed exemptions under D.C. Code § 38-506(1) because vaccinating their children violates their sincere religious beliefs.

Several Council members touted the Minor Consent Act in the weeks leading up to its passage as a way to "alter certain behaviors" and to "reduce any and all barriers to these treatments" posed by those who are "choosing not to vaccinate their children based on" the "anti-science belief[]" that "vaccines may cause autism or other harmful health effects." Amended Ver. Compl. ¶¶ 30,31. DCPS's Immunization Attendance Policy for the 2021-2022 school year complies with the Minor Consent Act. Amended Ver. Compl. ¶¶ 52-56.

Defendants are exerting tremendous pressure on Plaintiffs and their children through a mass media marketing campaign to push the COVID-19 vaccine. The intense marketing

campaign includes billboards, posters, fliers, printed ads, online ads, websites, emails, Twitter and other mass media advertising. Mayor Browser hawks "incentives" to receive vaccines, such as $51 gift cards, free ear buds and chances to win other prizes including I-pads and $25,000 scholarships. The mass media blitz contains catchy slogans, such as "Don't Wait. Vaccinate!" Amended Ver. Compl. ¶¶ 76, 77, 78, 85. Defendants' websites contain easy-to-follow instructions on how to locate vaccine walk-in clinics, including at District schools. The walk-in or "pop-up" clinics have been and will continue to be in the schools that Plaintiffs' children attend. Amended Ver. Compl. ¶¶ 79, 80, 84. See Exhibits 2-6 and 12 to Amended Ver. Compl.

Defendants are creating a culture of fear and compliance. The "10-layered mitigation health and safety framework," which includes, masks, saliva tests, nasal swabs, temperature screening, social distancing, self-isolation quarantine protocols and COVID vaccines, fosters this. Amended Ver. Compl. ¶¶ 96, 97, 109. And Defendants impose additional requirements on unvaccinated children. Amended Ver. Compl. ¶¶ 102, 103, 106, 108, 116-118; *see* Exhibit 7 to Amended Ver. Compl.

According to Defendants' contact tracing policy, if an unvaccinated student comes within six feet of a person who tests positive for COVID-19, then the unvaccinated student must isolate at home for 10 days. A vaccinated student is not subject to the same self-isolation requirements, although vaccinated students are also at equivalent risk of infection. Amended Ver. Compl. ¶¶ 102-103; *see COVID-19 Response Protocol FAQ*, #REOPENSTRONG, https://dcpsreopenstrong.com/health/response/, submitted herewith as Exhibit 19[1].

School policies that deny unvaccinated children the opportunity to play sports exert

---

[1]  Plaintiffs submitted Exhibits 1 through 18 with their Amended Verified Complaint. The Appendix of Exhibits submitted with this motion continues Plaintiffs' designation of exhibits to the Amended Verified Complaint and thus begins with Exhibit 19.

additional pressure. On or about November 2021, Defendants issued a document entitled "School Year 2021-22, Student Athletes: COVID-19 Vaccination Religious Exemption Certificate." *See* Exhibit 9 to Amended Ver. Compl. It requires the parent to detail his or her basis for a religious exemption. It further states, "this religious exemption request shall be reviewed by the school leader or designee." In reality, the Vaccination Religious Exemption Certificate is a request form subject to the whims of the same officials pushing the vaccine.

Even if a parent's request for a religious exemption is approved, the child is subject to additional restrictions. On the Vaccination Religious Exemption Certificate, the parent is required to initial the following: "I understand that student athletes with an approved religious exemption must: (1) wear a mask in athletic events (even if the current indoor masking order is rescinded or suspended); (2) be tested weekly for COVID-19: and (3) provide the school a negative COVID-19 test result on a weekly basis in order to report to their school based extracurricular activity." Amended Ver. Compl. ¶¶ 115-118.The additional requirements on student athletes intensify the pressure on Plaintiffs' children to defy their parents.

The pressure on student athletes falls most intensely on L.B. and H.B. Playing baseball with his friends is very important to L.B. and H.B. is an avid tennis player. Tennis is extremely important to H.B.'s life and identity. He is adamant that he will play tennis this year. H.B.'s older sister, who is seventeen, received the COVID-19 vaccine in direct opposition to Jane's parental judgment. Amended Ver. Compl. ¶¶ 283-287.

The overall pressure on L.B., a medically fragile child, is acute. He suffers from autoimmunity, including alopecia (severe hair loss), asthma and eczema. His hair loss is so severe that he is the only child in his class allowed to wear a baseball cap in class to conceal his severe baldness. Based on his medical history, L.B.'s hair loss and eczema appear to be causally

related to childhood immunizations. Amended Ver. Compl. ¶¶ 122, 125, 134-140.

L.B. has been singled out by Defendants' policies on at least two occasions. On September 9, 2021, medical testing teams came to L.B.'s class. The testers ordered all students to remove their things from their desks so they could collect saliva samples. When L.B. told the testers that his parents had not given him permission to take part in the tests, they ordered him to leave the room and stand in the hall. This occurred in full view of his friends and classmates. Amended Ver. Compl. ¶¶ 155-162.

The second time L.B. was singled out began on October 21, 2021. L.B. was forced to quarantine at home for ten days because he came within six feet of his teacher, who later tested positive for COVID-19. To the best of Victor's knowledge, none of the other children in the classroom were forced to remain home. When L.B. learned that he had to stay home for ten days because he was not vaccinated even though he was not sick, he became very upset. He cried and was angry that he could not go to school and take his math test. He does not want to isolate at home. He wants to go to school and be with his friends. L.B. has become increasingly angry, agitated and upset as a result of the pressure. Being isolated from friends places tremendous pressure on L.B. to defy his father and receive the vaccines without Victor's knowledge or consent. Amended Ver. Compl. ¶¶ 188-191.

Shortly before L.B. was forced to stay home from school for ten days for coming into contact with his teacher, who was vaccinated but tested positive for COVID-19, L.B. created the illustration at Exhibit 10 to Amended Ver. Compl. The computer-generated drawing depicts a child in distress. It states, "I feel like I'm being pressured into taking the vaccination because I feel like an outsider since everybody else has the vaccine and not only that but I feel like the vaccination is some sort of hall pass because I need the vaccination to go to certain places which

is very annoying. My parents sometimes fight over me and how mom and dad have different opinions about the vaccines so I am in a very tight space right now." L.B. made the drawing and statement shortly before the school suspended him for not being vaccinated after exposure. L.B. is correct: the vaccine is a "hall pass" "to go to certain places," specifically school. After L.B. was suspended, he created a second drawing entitled, "*PEER Pressure*," which is Exhibit 11 to the Amended Ver. Compl. It states, "C'mon dude" "take it" "Scared" "just do it" "I think" "you should." Both drawings reflect a child under tremendous pressure to submit to vaccination, even in defiance of his parents. Amended Ver. Compl. ¶¶ 194-197.

Before refiling the complaint, L.B. and Victor spoke about the rising level of peer pressure L.B. feels. L.B. said, **"if I were offered a vaccine, I would take it."** Amended Ver. Compl. ¶¶ 198. L.B. is being offered vaccines by the Defendants non-stop. They are advertising vaccine walk-in clinics including at L.B.'s school. He can register to reserve a specific time to receive the vaccine at the walk-in clinics at his school. Other than his own self-restraint, there is absolutely nothing preventing L.B. from receiving vaccines.

The D.C. Minor Consent Act and the available vaccine clinics provide an extremely tempting release from the tremendous pressure on L.B., K.G., N.W., and H.B. to receive vaccinations against their parents' sincere religious beliefs. To prevent this from happening, Plaintiffs brought a complaint for declaratory and injunctive relief.

The Minor Consent Act violates federal law in four respects: (1) it expressly contradicts Congressional mandates contained in the National Vaccine Act; (2) it deprives Plaintiffs of their right to free exercise of religion under the Religious Freedom Restoration Act; (3) it deprives Plaintiffs of their fundamental rights to free exercise of religion under the First Amendment; and (4) it strips them of their fundamental rights under the Fifth Amendment to direct the medical

care of their children. Because the threat to Plaintiffs' rights is both substantial and imminent,

they seek a preliminary injunction to enjoin the Minor Consent Act. Furthermore, regardless of

whether one or more of the children buckle and get vaccinations against their parents' wishes,

the constitutional rights of both the parents and children are being infringed.

## ARGUMENT

A preliminary injunction is an extraordinary remedy that may be granted at the discretion

of a court sitting in equity. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). It may be granted if the

movants show that (1) they are likely to succeed on the merits, (2) they will suffer irreparable

harm in the absence of preliminary relief, (3) the balance of the equities tips in their favor, and

(4) it serves the public interest. *League of Women Voters of the United States v. Newby*, 838 F.3d

1, 6 (D.C. Cir. 2016). The court then "balance[s] the strengths of the requesting party's

arguments in each of the four required areas," and "[i]f the showing in one area is particularly

strong, an injunction may issue even if the showings in other areas are rather weak." *Chaplaincy*

*of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Where the Government

is the opposing party, the last two factors merge because "the government's interest *is* the public

interest." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021), *quoting Pursuing*

*America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2009) (emphasis in original).

## I.   PLAINTIFFS' LEGAL CHALLENGES TO THE MINOR CONSENT ACT ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs "need not establish an absolute certainty of success" to obtain injunctive relief.

*Population Institute v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986). Instead, "[i]t will

ordinarily be enough that the plaintiff has raised serious legal questions going to the merits, so

serious, substantial, difficult as to make them a fair ground of litigation and thus for more

deliberative investigation." *Washington Metropolitan Area Transit Comm'n v. Holiday Tours,*

*Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). Here, Plaintiffs' verified complaint presents substantial claims against the Minor Consent Act under the National Childhood Vaccine Injury and Act of 1986, the Religious Freedom Restoration Act of 1993, the free exercise clause of the First Amendment, and the due process clause of the Fifth Amendment. The motion for preliminary injunction should be granted.

### A.   *The Minor Consent Act directly violates multiple statutory requirements of the National Childhood Vaccine Injury Act of 1986.*

The Supremacy Clause declares that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land. . . ." U.S. Const. Art. VI, cl. 2. "The Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621 (2011).

Whether a federal law preempts a lesser law under the Supremacy Clause hinges on Congress' intent in enacting the statute. *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 95 (1983). Federal preemption "may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Id.*, *quoting Jones v. Rath Packing Co*., 430 U.S. 519, 525 (1977).

Congress may engage in implicit preemption either through "field" preemption or "conflict" preemption. *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015). The former occurs when Congress creates "a framework of regulation" that "is 'so pervasive' that it leaves no space for state supplementation, or where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'" *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 347 (D.C. Cir. 2018),

*quoting Arizona v. United States*, 567 U.S. 387, 399 (2012). Conflict preemption "exists when the operation of federal and state law clash in a way that makes 'compliance with both state and federal law . . . impossible,'" or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Sickle*, 884 F.3d at 347.

> **1.    The National Vaccine Act's comprehensive regulatory framework for litigating vaccine injuries depends on the accurate recording and reporting of information specified by Congress.**

Congress passed the National Childhood Vaccine Injury Act of 1986 ("National Vaccine Act") to shield vaccine manufacturers from liability and to compensate vaccine injured children. As the Supreme Court explained in *Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011), the National Vaccine Act is based on the premise that vaccine injury is "unavoidable." If a large enough number of children are vaccinated, eventually some children will be seriously injured. Recognized vaccine injuries include severe neurological damage and death.

Through provisions in the National Vaccine Act, Congress created the National Vaccine Injury Compensation Program (VICP) to address these issues, as well as complaints that "obtaining compensation for legitimate vaccine-inflicted injuries was too costly and difficult." *Bruesewitz*, 562 U.S. at 227. As the Supreme Court explained, Congress's solution of "[f]ast, informal adjudication" is "made possible by the Act's Vaccine Injury Table, which lists the vaccines covered under the Act; describes each vaccine's compensable, adverse side effects; and indicates how soon after vaccination those side effects should first manifest themselves." *Id.* at 228.

The Vaccine Injury Table consists of a list of childhood vaccines, recognized injuries, and a time period. If the vaccine injury first manifests during the short time period listed on the table (referred to as a "table injury"), then the vaccine is presumed to have caused the injury and the child is entitled to compensation, unless the Department of Health and Human Services can

prove an alternative cause of injury. *Id.* If the child's injury is not listed on the Vaccine Injury Table, or if the injury is listed on the table, but the injury does not manifest until after the short time period listed on the table, then the petitioner bears the burden of proving causation. *Id.* at 228-29. This is referred to as a "non-table injury." Congress' regulatory scheme is dependent on recognizing vaccine injuries in a timely manner. Not only is timely recognition important for receiving follow-up medical care. It is also a critical element of proving that one is entitled to legal compensation for injuries that may be necessary for a lifetime of care.

The Supreme Court has repeatedly recognized that "state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" *Mensing*, 564 U.S. at 618, *quoting Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). The Minor Consent Act does just that, by injecting itself into Congress' carefully-crafted and carefully-calibrated regulatory scheme.

In order to achieve the goals of administering vaccines safely and compensating vaccine injured children, the National Vaccine Act contains specific mandates as to the publication and distribution of written vaccine information materials, known as Vaccine Information Sheets (VISs), which must be provided to parents before administration of vaccines. 42 U.S.C. § 300aa-26. The National Vaccine Act also requires health care providers to record specific information in a child's medical records when the child is administered vaccines. 42 U.S.C. § 300aa-25.

Moreover, Congress mandated that "the Secretary [of the U.S. Department of Health] *shall* develop and disseminate vaccine information materials for distribution by health care providers to the legal representatives of any child or to any other individual receiving a vaccine set forth in the Vaccine Injury Table. Such materials shall be published in the Federal Register and may be revised." 42 U.S.C. § 300aa-26(a) (emphasis added). A "legal representative" is "a

parent or an individual who qualifies as a legal guardian under state law." 42 U.S.C. § 300aa-33(2). Congress went on to declare that:

> The information in such materials shall be based on available data and information, shall be presented in understandable terms and *shall* include
>
> (1) a concise description of the benefits of the vaccine,
> (2) a concise description of the risks associated with the vaccine,
> (3) a statement of the availability of the National Vaccine Injury Compensation Program, and
> (4) such other relevant information as may be determined by the Secretary.

42 U.S.C. § 300aa-26(c) (emphasis added).

Critically, Congress declared in subsection (d), "Health care provider duties," that "each health care provider who administers a vaccine set forth in the Vaccine Injury Table *shall* provide to the *legal representatives of any child* . . . a copy of the information materials developed pursuant to subsection (a), supplemented with visual presentations or oral explanations, in appropriate cases. *Such materials shall be provided prior to the administration of such vaccine*." 42 U.S.C. § 300aa-26(d) (emphasis added).

When a statute uses the term "shall," it creates mandatory duties. *See, e.g., Lopez v. Davis*, 531 U.S. 230, 231 (2001) ("Congress used 'shall' to impose discretionless obligations"); *Green v. Bock Laundry Mach. Co*., 490 U.S. 504, 525 n.32 (1989) ("The process by which Congress changed the District of Columbia Code to provide that impeaching evidence 'shall,' not 'may,' be admitted . . . makes it evident that this mandatory language was intended"). Here, the Minor Consent Act imposes a contradictory set of duties on the very same actors: it is incompatible with the National Vaccine Act, and must yield under the Supremacy Clause. *Mensing*, 564 U.S. at 618.

### 2.    The Minor Consent Act violates 42 U.S.C. § 300aa-26.

Subsection (c) of the Minor Consent Act states, "The Department of Health shall produce

*alternative vaccine information sheets*, which shall be one or more age-appropriate made available before vaccination of minors to support providers in the informed consent process." 42 U.S.C. § 300aa-26(c) (emphasis added). **Appendix A** contains the Vaccine Information Materials—commonly referred to as Vaccine Information Statements (VISs)—produced by the U.S. Department of Health for the vaccines at issue here.

The word "alternative" is defined as "One or the other of two things: giving an option or choice: allowing a choice between two or more things or acts to be done." *What is Alternative*, THE LAW DICTIONARY (2021), *available at* https://thelawdictionary.org/alternative/ (accessed July 5, 2021). 42 U.S.C. § 300aa-26(d) clarifies that the required VISs may be "supplemented." But an alternative is not a supplement. *See What is Supplemental*, THE LAW DICTIONARY (2021), *available at* https://thelawdictionary.org/supplemental/ (accessed July 5, 2021) (defining "supplemental" as "Something added to supply defects in the thing to which it is added, or in aid of which it is made"). A state or local law, offering an "alternative" to federally mandated vaccine information materials, by definition, is a violation of the doctrine of preemption and the Supremacy Clause of the Constitution.

The National Vaccine Act explicitly mandates that HHS develop and publish vaccine information materials in consultation with the Advisory Commission on Childhood Vaccines, appropriate health care providers and parent organizations, the CDC, and the FDA. *See* 42 U.S.C. § 300aa-26(b). The Minor Consent Act usurps the responsibility and authority of the private entities and federal government agencies, which Congress entrusted and assigned the responsibility to develop and publish VISs.

Furthermore, the National Vaccine Act explicitly mandates VISs must be provided to the parents before vaccine administration. By use of the word "alternative," the Minor Consent Act

violates the express written mandates of the National Vaccine Act and abolishes the rights of both the parent and child for the parent to receive the federally mandated VISs. In the process, the Minor Consent Act recklessly places children at risk of serious harm and death.

Vaccine injury is real. *See Brusewitz*, 562 U.S. at 227 (explaining that concerns about vaccines for diphtheria, tetanus, and pertussis (DTP) led to "a massive increase in vaccine-related tort litigation" in the mid-1980s, prompting Congress to create the National Vaccine Act). Since the Vaccine Injury Compensation Program was enacted, the VICP has paid over $4.6 billion in compensation for vaccine injuries. *See* Exhibit 16 to Amended Ver. Compl. The Injuries listed on the Vaccine Injury Table, which is reproduced in Exhibit 14 to Amended Ver. Compl., include encephalopathy (brain injury), paralysis and death. Federally mandated VISs are extremely important in preventing unnecessary vaccine injury.

VISs are designed to provide parents with the minimum amount of information necessary to understand the benefits and risks of administering immunizations to form and give informed consent.  *See* Exhibit 17 to Amended Ver. Compl., *DTaP* (*Diptheria, Tetanus, Pertussis*) *Vaccine: What You Need to Know* (warning that risks may include "soreness or swelling where the shot was given, fever, fussiness, feeling tired, loss of appetite, and vomiting," and may also include more serious reactions such as "seizures," "non-stop crying for 3 hours or more," a "high fever," "swelling of the entire arm or leg," "long-term seizures, coma, lowered consciousness, or permanent brain damage"). See Exhibit 17 to Amended Ver. Compl., *Influenza* (*Flu*) *Vaccine (Inactivated or Recombinant): What You Need to Know* (warning that risks may include "soreness, redness, and swelling where shot is given, fever, muscle aches, and headache," as well as "a very small increased risk of Guillain-Barre Syndrome (GBS)," and that "Young children who get the flu shot along with pneumococcal vaccine (PCV13) and/or DTap vaccine at the

14

same time might be slightly more likely to have a seizure caused by fever. Tell your health care provider if a child who is getting flu vaccine has ever had a seizure"). *See* Exhibit 17 to Amended Ver. Compl., *Pneumococcal Conjugate Vaccine* (*PCV13*)*: What You Need to Know* (warning that risks may include "redness, swelling, pain or tenderness where the shot is given, and fever, loss of appetite, fussiness (irritability), feeling tired, headache, and chills," and that "Young children may be at increased risk for seizures caused by fever after PCV13 if it is administered at the same time as inactivated influenza vaccine. Ask your health care provider for more information").

The information contained on the mandatory VISs is critical to prevent serious harm, including neurological damage to a child. A primary purpose of the VISs is to educate so that parents are able to recognize vaccine "adverse events." These "adverse events" include encephalopathy (brain injury) and death. If a child receives an immunization without parents' knowledge or consent, they likely will have no way of recognizing if the child has suffered a vaccine injury. Not recognizing that the child has suffered a vaccine adverse reaction can cause serious medical consequences. If the parent has not been provided the minimum information necessary to recognize an adverse event, she will not know to seek immediate medical attention. The parent will also not know that some vaccine adverse reactions are listed as precautions and contraindications to further vaccination. Furthermore, if VISs are not provided, then the parents will not know of the existence of the National Childhood Vaccine Injury Compensation Program.

### 3.    The Minor Consent Act violates 42 U.S.C. § 300aa-25(a).

The Minor Consent Act amended Section 3(a) of the Student Health Care Act of 1985 to add the following:

> (2) If a minor student is utilizing a religious exemption for vaccinations or is opting out of receiving the Human Papillomavirus vaccine, but the minor student is receiving vaccinations under section 600.9 of Title 22-B of the District of Columbia Municipal

15

> Regulations (22-B DCMR § 600.9), the health care provider shall leave *blank* part 3 of the immunization record, and *submit the immunization record directly to the minor student's school*. The school shall keep the immunization record received from the health care provider confidential; except, that the school may share the record with the Department of Health or the school-based health center.

(Emphasis added.)

The Act's requirement that a health care provider leave a child's immunization record

"*blank*" is not only recklessly dangerous to the child, but also blatantly violates 42 U.S.C.

§ 300aa-25(a), which states:

> Each health care provider who administers a vaccine set forth in the Vaccine Injury Table to any person *shall record*, or ensure that there is recorded, in such person's permanent medical record (or in a permanent office log or file to which a legal representative shall have access upon request) with respect to each such vaccine:
> (1) the date of administration of the vaccine,
> (2) the vaccine manufacturer and lot number of the vaccine,
> (3) the name and address and, if appropriate, the title of the health care provider administering the vaccine, and
> (4) any other identifying information on the vaccine required pursuant to regulations promulgated by the Secretary.

(Emphasis added.) The Minor Consent Act explicitly violates these federal requirements.

The Minor Consent Act also violates an additional command in section 300aa-25(a). It

states that health care workers who administer vaccines to a child without the parents'

knowledge or consent "shall submit the immunization record directly to the minor's school. The

school *shall keep this immunization record confidential*, except it may share the record with the

Department of Health or the school-based health center." In contrast, 42 U.S.C. § 300aa-25(a)

mandates that "[e]ach health care provider who administers a vaccine set forth in the Vaccine

Injury Table to any person *shall record, or ensure that there is recorded, in such person's*

*permanent medical record (or in a permanent office log or file to which a legal representative*

*shall have access upon request)* with respect to each such vaccine" (emphasis added). A "legal

representative" includes parents. 42 U.S.C. § 300aa-33(2). This presents yet another clear

16

conflict: the Minor Consent Act commands that the immunization record shall be confidential to hide from parents that the child has been vaccinated, while Congress commands that parents "shall have access upon request" to those records. Medical providers cannot comply with both acts at the same time. The Supremacy Clause demands that the Minor Consent Act yield to federal law.

### 4.    The Minor Consent Act violates 42 U.S.C. § 300aa-25(b).

42 U.S.C. § 300aa-25(b) mandates the reporting of vaccine adverse events within specified time periods. However, if a health care provider does not comply with subsection (a) by recording the required information, then it becomes almost impossible to comply with subsection (b), "Reporting adverse events." Section 300aa-25(b) states in pertinent part:

(1) Each health care provider and vaccine manufacturer shall report to the Secretary—
    (A) the occurrence of any event set forth in the Vaccine Injury Table, including the events set forth in section 300aa–14(b) of this title which occur within 7 days of the administration of any vaccine set forth in the Table or within such longer period as is specified in the Table or section,
    (B) the occurrence of any contraindicating reaction to a vaccine which is specified in the manufacturer's package insert, and
    (C) such other matters as the Secretary may by regulation require….

(2) A report under paragraph (1) respecting a vaccine **shall include the time periods after the administration of such vaccine within which vaccine-related illnesses, disabilities, injuries, or conditions, the symptoms and manifestations of such illnesses, disabilities, injuries, or conditions, or deaths occur, and the manufacturer and lot number of the vaccine**.

(Emphasis added.)

If a health care provider abides by the Minor Consent Act and leaves the immunization record "blank", then it is impossible to comply with subsection (b) ("the reporting of vaccine adverse events") because the health care provider will not have recorded critical information required to be in any vaccine adverse event report. Also, by hiding the fact that a child has been vaccinated from parents, they likely will never know if the child had a vaccine adverse reaction

and the adverse reaction will not be reported.

### 5.     The Minor Consent Act violates 42 U.S.C. § 300aa-25(c).

Finally, Congress has adopted a specific subsection, titled "Release of information," which governs the disclosure of vaccine information. 42 U.S.C. § 300aa-25(c) "**Release of information"** specifies what information shall or shall not be available to the public. However, the information which is "shall not" be available to the public shall be available to "the legal representative" of "the person who received the vaccine."

A health care provider cannot both record the information listed in the statute *and* leave the child's immunization record "blank." Again, providers cannot comply with both acts at the same time. Moreover, subsection (c) specifically authorizes the release of information to "the legal representative of such person"—the child's parent. The Minor Consent Act says the exact opposite. This not only undermines Congress's intent in creating the National Vaccine Act, but also undercuts the practical mechanism Congress created to deal with vaccine injuries—the Vaccine Adverse Event Reporting System (VAERS)—which assumes that vaccine information will be accurately recorded, not concealed.

By enacting the National Vaccine Act, Congress created "a framework of regulation" that "is 'so pervasive' that it leaves no space for . . . supplementation" by the District. *Sickle*, 884 F.3d at 347. Section 300aa-26 mandates the information that must be provided to parents before children may be vaccinated, while section 300aa-25 mandates what information must be recorded in their permanent medical records and what information must be provided to parents. By ordering health care providers to not record specific information in immunization records, and ordering health care providers, school officials and government agents to conceal immunization records from parents, the Minor Consent Act "makes 'compliance with both state and federal law . . . impossible.'" *Sickle*, 884 F.3d at 347. Plaintiffs are likely to prevail on their

Supremacy Clause claim because the Minor Consent Act imposes contradictory, mandatory duties on those who administer vaccines to children, and those conflicts "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* The District's law must yield.

### *The COVID-19 vaccine is not covered by the National Vaccine Act, however the logic underlying the need for parental supervision rights is even greater for this Emergency Use Authorization product.*

Primarily because the Pfizer-BioNTech COVID-19 vaccine represents novel, experimental technology, it is not covered by the National Vaccine Act. Unlike the childhood vaccines covered by the National Vaccine Act, the Pfizer-BioNTech COVID-19 vaccine has not received FDA approval. It is a biologic countermeasure under Emergency Use Authorization (EUA) in accordance with 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(1-111) of the Federal Food, Drug, and Cosmetic Act and the Public Readiness and Preparedness Act (PREP Act), 42 U.S.C. § 247. Its full range of risks are unknown.

Under the PREP Act, vaccine manufacturers, healthcare providers and government planners cannot be held liable for any injuries, except for "willful misconduct" by a clear and convincing standard. No matter how defective or unreasonably dangerous, vaccine manufacturers cannot be held liable for design or manufacturing defects. In the real world, if there is no liability, there is no incentive for safety.

Pfizer is well aware that its COVID-19 vaccines carry significant risk of myocarditis and pericarditis (inflammation and damage of the heart muscle and the thin sac surrounding the heart). On October 26, 2021, Pfizer-BioNTech acknowledged the risks of myocarditis and pericarditis on page 13 of a key document entitled "*Vaccines and Related Biological Products Advisory Committee Meeting October 26, 2021, FDA Briefing Document, EUA amendment for*

*Pfizer-BioNTech COVID-19 Vaccine for use in children 5 through 11 years of age*," FDA.GOV,

https://www.fda.gov/media/153447/download, a copy of which is submitted herewith as Exhibit

20. The document's purpose was to obtain EUA for the Pfizer-BioNTech COVID-19 vaccine for

use in children 5 through 11 years of age.

Page 13 of Pfizer's document states:

**Myocarditis and pericarditis**

Post-EUA safety surveillance reports received by FDA and CDC identified
increased risks of myocarditis and pericarditis, particularly within 7 days
following administration of the second dose of the 2-dose primary series.
Reporting rates for medical chart-confirmed myocarditis and pericarditis in
VAERS have been higher among males under 40 years of age than among
females and older males and **have been highest in males 12 through 17 years of
age.**

On page 14, Pfizer-BioNTech requested authorization to modify the formulation of the

Pfizer-BioNTech COVID-19 vaccine by adding tromethamine, a drug commonly used to treat

heart attack or cardiac bypass surgery patients. Adding this to the Pfizer-BioNTech COVID-19

vaccine underscores the risk of heart complications in children who receive the Pfizer-BioNTech

COVID-19 vaccine.

Vaccine Fact Sheets and Prescribing Information now note the risks of myocarditis and

pericarditis. See Exhibit 18 to Amended Ver. Compl. for a copy of the Pfizer-BioNTech

COVID-19 vaccine Fact Sheet. The "Fact Sheet" operates much the same as VISs for vaccines

covered by the National Vaccine Act and must be provided under the PREP Act EUA provisions.

Although the Pfizer-BioNTech COVID-19 vaccine is not covered by the National Vaccine Act,

vaccine injured children can receive compensation through the Countermeasures Injury

Compensation Program (CICP). *See Countermeasures Injury Compensation Program (CICP)*,

HEALTH RESOURCES AND SERVICES ADMINISTRATION, https://www.hrsa.gov/cicp. Like the

National Vaccine Injury Compensation Program, compensation under the CICP is based on an "Injury Table" in which timely recognition of the first manifestation of injury is critical.

Therefore, the need and justification for parental supervision and involvement is even greater with the Pfizer-BioNTech COVID-19 vaccine than routine childhood vaccinations.

### B.    The Minor Consent Act substantially burdens Plaintiffs' fundamental right to freely exercise religion in violation of the Religious Freedom Restoration Act.

In 1993, a near-unanimous Congress enacted the Religious Freedom Restoration Act (RFRA). Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise," and that "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb(a)(2)-(3). RFRA created a cause of action to vindicate free exercise rights. 42 U.S.C. § 2000bb-1(c). The District is subject to RFRA. 42 U.S.C. § 2000bb-2.

If the Government substantially burdens a plaintiff's free exercise of religion, that plaintiff is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014), *citing* 42 U.S.C. § 2000bb-1(b). The Minor Consent Act does not meet this "exceptionally demanding" standard. *Hobby Lobby*, 573 U.S. at 728.

### 1.    The Minor Consent Act substantially burdens Plaintiffs' right to free exercise of religion.

RFRA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4), 42 U.S.C. § 2000cc-5(7). "[B]ecause the burdened practice need not be strictly compelled by the religious tradition at issue to merit protection, courts 'focus not on the centrality of the particular activity

to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened.'" *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 293-294 (D.D.C. 2020), *quoting Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008).

Here, Plaintiffs have sincere religious beliefs against vaccinating their minor children and have acted on those beliefs by asserting religious exemptions. The District may disagree with those beliefs—indeed, several District Council members have expressed their disagreements publicly. But the District cannot lawfully "[a]rrogat[e] the authority to provide a binding . . . answer to this religious and philosophical question." *Hobby Lobby*, 573 U.S. at 724. "Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990); *see also Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 715 (1981) ("Intrafaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses"); *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds"); *West Virginia Bd. of Ed. v. Barnette*, 319 U. S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion").

"A 'substantial burden' exists when government action rises above *de minimis* inconveniences and puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling*, 553 F.3d at 678. This occurs even if the government "propose[s] alternatives" that it believes are "sensible substitutes." *Capitol Hill Baptist Church*,

22

496 F. Supp. 3d at 294.

The Minor Consent Act doesn't place a "*de minimis* inconvenience[]" on parents—it expressly overrides their decisions and violates their religious beliefs. This distinguishes the Act from the more "typical" vaccine cases, like *Doe v. Zucker*, 496 F. Supp. 3d 744, 756 (N.D. N.Y. 2020), where the government merely conditions a benefit—such as in-person school attendance—on the receipt of vaccinations, or where the state has decided to create one category of exemption, but not another. Because such laws "do not force parents to consent to vaccination of their children," courts in cases like that one could frame the substantive due process right at issue differently—a non-fundamental right to be free from "condition[ing] [a] child[]'s right to attend school on vaccination," for example. *Id.* This case is different: the District *already* requires vaccinations for school attendance and has already created an exemption for parents. D.C. Code § 38-506(1).

The Minor Consent Act is an entirely different kind of statute because it allows for the *actual vaccination* of children over parents' objections without parental knowledge. *C.f. B.W.C. v. Williams*, 990 F.3d 614, 621 (8th Cir. 2021) (holding that Missouri's religious exemption form did not violate the free exercise clause because it merely "communicate[d] neutrally to anyone considering opting out on religious grounds that the government discourages it," but said that "'the ultimate decision is yours'—the parents," and did not "force their children to get immunized"). Before the Minor Consent Act, if a parent claimed a religious exemption, the District could not override that decision. Now, it can. And it does so by exerting "substantial pressure" on parents and children to "modify [their] behavior and to violate [their] beliefs,'" *Kaemmerling*, 553 F.3d at 678, and by cutting the parents out of the decision-making process entirely. This is not a "*de minimis*" burden. *Id.* Depriving a religious parent of the right to

meaningfully object to vaccinations damages the right of conscience. *Actually* administering a vaccine to a child, in secret, when the District *knows* that doing so will violate a parent's sincere religious beliefs, is far worse.

> **2.    The District does not have a compelling government interest in offering parents a religious exemption with one hand, and then stripping them of that exemption's protections with the other.**

Before it can burden free exercise, "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006), *citing* 42 U.S.C. § 2000bb-1(b). As the Supreme Court held this past term, in *Fulton v. City of Philadelphia*, ___ U.S. ___, 2021 U.S. LEXIS 3121 (2021), "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants.' The question, then, is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception…." *Id.* at *26 (internal citations omitted, brackets in original).

When analyzing RFRA claims, courts "look beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro*, 546 U.S. at 431. No such harm is present here. All Plaintiffs have claimed a religious exemption under District law—in some cases, for years. None of their children have caused any outbreaks or public health crises in the past; and there is no reason to believe they will now while attending school under a religious exemption that the District has neither suspended nor eliminated. *See Holt v. Hobbs*, 574 U.S. 352, 368 (2015) ("[T]he Department has not argued that denying petitioner an exemption is necessary to further a compelling interest . . . . At bottom, this

argument is but another formulation of the 'classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions.' We have rejected a similar argument in analogous contexts, and we reject it again today"), *quoting Gonzales v. O Centro*, 546 U.S. at 436; *see also Capitol Hill Baptist*, 496 F. Supp. 3d at 298 ("The District cannot rely on its generalized interests in protecting public health or combating the COVID-19 pandemic. Rather, RFRA requires the District to 'demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened'").

Nor can the District rely on the generalized compelling interests that courts typically rely on in cases like *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). First, *Jacobson* does not control cases that are brought under RFRA. While *Jacobson* used a more "relaxed standard" to evaluate a Massachusetts smallpox regulation, "Congress incorporated a specific burden-shifting framework into RFRA" that "'did more than merely restore the balancing test used in the [pre-*Smith*] line of cases; it provided even broader protection for religious liberty than was available under those decisions.'" *Capitol Hill Baptist*, 496 F. Supp. 3d at 297, *quoting Hobby Lobby*, 573 U.S. at 695 n. 3. Accordingly, "Courts must respect that decision and dutifully apply its scheme." *Capitol Hill Baptist*, 496 F. Supp. 3d at 297.

More importantly, while *Jacobson* recognized the traditional "power of the states to enact and enforce quarantine laws for the safety and the protection of the health of their inhabitants," Justice Harlan stated repeatedly that the regulation at issue was adopted by the Cambridge Board of Health at a time when smallpox was "prevalent and increasing at Cambridge." *Jacobson*, 197 U.S. at 28. "*If such was the situation*," the regulation would be "justified by the necessities of the case," and the Court would not "usurp the functions of another branch of the government." *Id.*

(emphasis added). But if the "necessities of the case" were different, so too would be the court's deference. "It might be," the Court warned, "that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all, might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id.* And if the government adopts an "arbitrary" law—"if a statute *purporting* to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law"—then "it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id.* at 31.

The Minor Consent Act is such a law. Whereas *Jacobson* dealt with a uniform, vaccination regulation, which was designed "to meet and suppress the evils of a[n] . . . epidemic that imperilled an entire population," *id.* at 30-31, the Minor Consent Act is aimed squarely at children whose parents have claimed a lawful exemption that the District *created*. Whatever position the District takes on the "opposing theories" of vaccinations, *id.* at 30, its decision to recognize religious exemptions in the first place suggests that such exemptions are not inherently incompatible with the demands of public health.

While several members of the Council cited the COVID-19 pandemic to justify the Minor Consent Act, the list of vaccines that the District could administer without parents' knowledge when it adopted the act in March 2021 did *not* include the COVID-19 vaccine. Instead, the Act is limited to vaccines the Advisory Committee on Immunization Practices ("ACIP") recommends. And until May 12, 2021, that list included only routine childhood

vaccines. *See* D.C.M.R., Title 22-B, § 600.9(a). If the purpose of the Minor Consent Act was to truly react to the "necessities" of a global pandemic, this reliance on independent action from ACIP is a curious drafting choice.

Perhaps the *real* goal of the Minor Consent Act is not to react to a global pandemic, but to bypass the decisions of religious parents who object to *any* ACIP-recommended vaccinations, whether pre- or post-pandemic. That would be illegal, though, even under *Jacobson's* deferential standard: the District cannot adopt a statute "*purporting* to have been enacted to protect the public health," but which is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. The Minor Consent Act does just that. And, of course, laws that "singl[e] out a certain class of citizens for disfavored legal status or general hardships" are constitutionally suspect for many other reasons. *Romer v. Evans*, 517 U.S. 620, 633 (1996); *see also id.* at 634-35 ("[L]aws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. 'If the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest'"), *quoting Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973).

### 3.    The Minor Consent Act is not narrowly tailored.

"The least-restrictive-means standard is exceptionally demanding"— to prevail, the government must "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Holt*, 574 U.S. at 364-65, *quoting Hobby Lobby*, 573 U.S. at 728. "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815 (2000).

Plaintiffs contend that the Minor Consent Act does not further any compelling interest rooted in health or safety. There are clearly less-restrictive approaches to accomplish that. One need look no further than the status quo before the Act was adopted. The District required children to have certain vaccines to attend school. D.C. Code § 38-502. The District allowed parents to exempt their children from those requirements based on their sincere religious beliefs. D.C. Code § 38-506(1). And the District respected that choice. There is no doubt that requiring parents to claim a religious exemption in writing, and then respecting that claim, imposes a much lower burden on the free exercise rights of parents than requiring them to claim a religious exemption in writing, and then ignoring that claim based on the sole discretion of non-parents who disagree with it. As the Supreme Court has noted repeatedly in the context of free expression, it is unconstitutional to "make[] the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official. . . ." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969). Yet that is precisely what the Act does. In so doing, the Minor Consent Act clearly violates the free exercise rights of parents under RFRA.

C.       ***The Minor Consent Act violates the free exercise clause of the First Amendment.***

The First Amendment to the Constitution states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The First Amendment clearly applies to state and local governments. *Cantwell v. Connecticut*, 310 U.S. 296 (1940). The Minor Consent Act is unconstitutional on its face. Specifically, the Amendment to D.C. Code § 38-602(b)(2) states: "if a minor is utilizing a religious exemption for vaccinations… the health care provider shall leave blank part 3 of the immunization record." This part of the Minor Consent Act is specifically targeting and endangering children whose parents have claimed a lawful religious exemption. This is directly contrary to the religious neutrality the Constitution requires.

28

"The Constitution commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their high duty to the Constitution and to the rights it secures." *Masterpiece Cakeshop, LTD., v. Colorado Civil Rights Commission* 138 S. Ct. 1719, 1731 (2018) (internal citations omitted).

   The State has a "duty under the first amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece Cakeshop.* 138 S. Ct. at 1721, yet this is exactly what the D.C. Minor Consent Act does. As the Supreme Court explained in *Masterpiece Cakeshop*, the government's "hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Id.* The D.C. Minor Consent Act is not neutral toward religion; it specifically targets children whose parents have exercised lawful religious rights.

   In essence, the Minor Consent Act commands that if a parent files a lawful religious exemption from vaccinations for her child, then not only is her religious exemption ignored, but also the protections of 42 U.S.C. § 300aa-25(a) are stripped away. The Minor Consent Act is clearly hostile to religion, because whether the vaccination record is left "blank" is based upon the parents' religious exemption form. The Minor Consent Act clearly violates the First Amendment because the District disregards very specific rights under the Vaccine Act *because* the parent exercised a lawful religious right.

   **D.   *The Minor Consent Act deprives Plaintiffs of their fundamental rights to direct the medical care of their children, in violation of the due process clause of the Fifth Amendment***

   "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Citing "extensive precedent," *Troxel*

29

concluded that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66; *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment").

The fundamental right implicated here—the right of fit parents to be informed of and to consent to the immunizations of their minor children in non-emergency situations—lies at the core of this liberty interest. "[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Troxel*, 530 U.S. at 65-66, *quoting Prince v. Massachusetts*, 421 U.S. 158, 166 (1944). "The right and liberty interest in parenting and the right to refuse unwanted medical procedures are fundamental rights." *Doe v. Zucker*, 496 F. Supp. 3d at 756, *citing Troxel*, 530 U.S. at 66; *see also Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990) (finding a "constitutionally protected liberty interest in refusing unwanted medical treatment").

Through the Minor Consent Act, the District has arrogated to itself—and to the unspecified class of persons who may administer vaccines to minors under the Act—the power

to override fit parents' decisions. While parental rights are not absolute, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 U.S. at 72-73. Much more is required, and the Minor Consent Act again falls short.

> ### 1. The Minor Consent Act makes no attempt to rebut the presumption that fit parents act in the best interests of their children.

The Supreme Court has consistently recognized that "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68. This presumption extends to medical decisions, as well as other child-rearing decisions. In *Parham v. J.R.*, the Supreme Court held that parents "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (brackets in original). "Surely," the Court said, this must "include[] a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.*

There is no doubt that vaccination carries risk, including of brain damage and death. That is precisely why Congress created the National Vaccine Act, why Congress requires that patients be provided with VISs before vaccination, and why Congress requires that these statements be provided to parents *before* vaccines can be administered to minor children. *See* 42 U.S.C. § 300aa-26(d).

For minors, who *cannot* legally consent to many things, that assumption of risk lies with parents. "The law's concept of the family rests on the presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602; *see also Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. . . . While the therapeutic benefits of

antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects") (internal citations omitted); *Van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 867 (2d Cir. 1990) ("[T]the constitutional liberty interest of parents in the 'care, custody, and management of their child' includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children") (internal citations omitted); *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 1999) ("[P]arents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention . . . . Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations—particularly those, such as here, that are invasive or upsetting"); *Mann v. Cty. Of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) ("The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state").

Here, Victor, Shameka, Shanita, and Jane are all fit parents. They have used their own maturity, experience, and capacity for judgment to decide whether to vaccinate their children. They have decided that vaccinating their children would be contrary to their sincere religious beliefs. And they have expressed that to the District by filing religious exemptions, which they have a statutory right to do under D.C. Code § 38-506(1). As fit parents, the Fifth Amendment presumes that their decisions are in the best interests of their children.

The Minor Consent Act takes the opposite approach: if someone disagrees with a parent's decision not to vaccinate his or her child, and believes that the child can provide informed consent, then the parent's decision can be ignored and a vaccine can be administered without the parent's knowledge, much less consent. But a parent's decision not to vaccinate a child does not

make that parent unfit. And even if an eleven-year-old child had the knowledge of vaccine warnings and her own personal medical history to give informed consent, that also wouldn't render his or her parent "unfit."

In short, the Minor Consent Act overlooks the core demand of the Fifth Amendment: the decisions of fit parents cannot be infringed based on "nothing more than a simple disagreement" between the District and parents concerning a child's best interests. *Troxel*, 530 U.S. at 60. "[W]hile the need to protect children from *unfit* parents is a well-recognized compelling reason for burdening family integrity, defendants must make at least some showing of *parental unfitness* in order to establish such a compelling state interest." *De Nolasco v. United States Immigration & Customs Enforcement*, 319 F. Supp. 3d 491, 501 (D.D.C. 2018) (emphasis added), *citing Quillion v. Walcott*, 434 U.S. 246, 255 (1978). Absent a showing of unfitness, the State is simply not on an equal footing with parents when it comes to child rearing decisions. As the Supreme Court held in *Troxel*, "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69.

The Minor Consent Act does not even *account* for the presumption that fit parents act in the best interests of their children, much less *rebut* that presumption. The Act draws no distinction whatever between "fit" and "unfit" parents: *any* parent's decision can be ignored if someone believes that a child can give informed consent. And no parent—no matter how fit— will be told if her child is vaccinated against her wishes. On the contrary, that fact will be *hidden*. D.C. Code § 38-602(a)(2). This violates the Fifth Amendment.

**2.      The Minor Consent Act does not give special weight to the decisions of fit parents.**

In *Troxel*, the "problem" identified by the Supreme Court was that when the Superior Court intervened in the mother's visitation decision, "it gave no special weight to [her] determination of her daughters' best interests." *Troxel*, 530 U.S. at 60. The Court held that "if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord *at least* some special weight to the parent's own determination." *Id.* at 70 (emphasis added).

Here, rather than presuming that fit parents act in the best interests of their children, and then giving special weight to a parent's decision that his or her child should not be vaccinated, the Minor Consent Act does the exact opposite. The parent's decision is not factored into the equation at all, much less given "special weight." *See* D.C.M.R., Title 22, § 600.9(a) And if a child's parent files a religious exemption or an HPV exemption, her decision is *targeted*, not protected. *See* D.C. Code § 38-602(a)(2).

**3.      The Minor Consent Act is not narrowly tailored to further a compelling state interest.**

A fit parent's decision with respect to the care, custody, and control of his or her child cannot be overridden by the government unless it has a compelling interest, and its actions are narrowly-tailored to accomplish that compelling interest. The due process clause "forbids the government to infringe . . . 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (emphasis in original).

Because the liberty interest shared by children and parents is "fundamental," the Minor Consent Act must "promote, in a particular case, compelling governmental interests," and "[i]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally

protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Franz v. United States*, 707 F.2d 582, 607 (D.C. Cir. 1983). "This principle has been repeatedly reaffirmed when constitutionally protected familial rights have been threatened." *Id.*, *citing Carey v. Population Services International*, 431 U.S. 678, 686 (1997); *Doe v. Bolton*, 410 U.S. 179, 194-95 (1973); *see also De Nolasco*, 319 F. Supp. at 500 ("Substantial governmental burdens on family integrity are subject to strict scrutiny review, and they survive only if the burden is narrowly tailored to serve a compelling state interest"), *citing Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007).

Plaintiffs are likely to prevail on their Fifth Amendment claim for the same reasons they are likely to prevail under RFRA: the Minor Consent Act, as applied, does not further any compelling government interest because the District has no particular reason to deny Plaintiffs the same exemption now that it has given them before—and still offers. Nor is the Minor Consent Act narrowly tailored to accomplish any of the interests that animate traditional vaccination laws. *See supra* at 18-22. The motion should be granted.

## II.    WITHOUT INJUNCTIVE RELIEF, PLAINTIFFS WILL BE IRREPARABLY HARMED.

Plaintiffs will be irreparably harmed if this Court is satisfied that the injury complained of is "beyond remediation," *League of Women Voters*, 838 F.3d at 7-8, as opposed to "purely financial or economic," *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015), and if "[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The motion should be granted because the injuries complained of are both irreparable and imminent.

35

**A.     The deprivation of statutory and constitutional rights is an irreparable injury.**

"It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), *quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Because the deprivation of constitutional rights is an irreparable injury, "by extension the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment." *Capitol Hill Baptist*, 496 F. Supp. at 301, *quoting Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012). The Minor Consent Act substantially burdens the right of parents who have sought and claimed a lawful vaccine exemption because of their sincere religious beliefs. The resulting injury is not merely economic; it is irreparable.

Finally, this Court has recognized that the loss of a clear statutory entitlement is not "merely economic" harm, for the same reason that the loss of a constitutional right is not merely economic: "[o]nce the statutory entitlement has been lost, it cannot be recaptured." *Hi-Tech Pharmacal Co. v. United States FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008), *quoting Apotex, Inc. v. FDA*, 2006 U.S. Dist. LEXIS 20894 at *17 (D.D.C. Apr. 19, 2006) (UNPUBLISHED), *aff'd*, *Apotex, Inc. v. FDA*, 449 F.3d 1249 (D.C. Cir. 2006). The National Vaccine Act imposes duties on those who administer vaccines, that are commensurate not only with the constitutional rights of parents, but the right to be free from nonconsensual medical care in general. Information about vaccine risks *must* be disclosed to patients before vaccines are administered, and when the patient is a minor child, that information must be disclosed to a parent. The Minor Consent Act is not only inconsistent with the National Vaccine Act—it expressly contradicts it. And in so doing, it will deprive parents of their statutory right to know that their child is about to be vaccinated,

36

and the risks attendant to that decision. If that opportunity is lost, "it cannot be recaptured." And

no amount of economic damages will make up for it. *Hi-Tech Pharmacal*, 587 F. Supp. 2d at 11.

      **B.**      **The District's threat to the constitutional rights of Plaintiffs is imminent.**

An irreparable injury is imminent if a violation of protected rights is "either ongoing or

threatened." *Wagner v. Taylor*, 836 F.2d 566, 576 n. 76 (D.C. Cir. 1987). "As a preliminary

injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to

actually fall on all appellants before the court will issue an injunction." *League of Women Voters*,

838 F.3d at 8-9, *citing Winter v. NRDC, Inc.,* 555 U.S. 7, 22 (2008).

*Mills v. District of Columbia*, 571 F.3d 1304, is instructive on this point. In *Mills*, citizens

of the District challenged a Neighborhood Safety Zones (NSZ) checkpoint program where

Metropolitan Police Department (MPD) officers would stop and ask motorists if they had a

"legitimate reason" for entry into that zone. *Mills v. District of Columbia*, 584 F. Supp. 2d 47,

50-51 (D.D.C. 2008). The District Court denied the plaintiffs' motion for a preliminary

injunction, concluding both that they were unlikely to prevail on the merits and that they could

not prove irreparable harm.

On appeal, the D.C. Court of Appeals reversed. After concluding that the plaintiffs were

likely to prevail in their Fourth Amendment challenges, the Court "further conclude[d] that

appellants have sufficiently demonstrated irreparable injury, particularly in light of their strong

likelihood of success on the merits." *Mills*, 571 F.3d at 1312. The myriad problems with the

checkpoint program made it "apparent that appellants' constitutional rights are violated," *id.*, and

as the Court had held before, a preliminary injunction may issue "where there is a particularly

strong likelihood of success on the merits even if there is a relatively slight showing of

irreparable injury." *CityFed Fin. Corp. v. Office of Thrift Supervision, United States Dep't of

Treasury*, 58 F.3d 738, 747 (D.C. Cir. 1995), *citing McPherson,* 797 F.2d at 1078.

Moreover, "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills*, 571 F.3d at 1312, *quoting Elrod*, 427 U.S. at 373. Faced with a clear constitutional violation, and a stated intention on the part of the District to violate that right in the future, the court concluded that the "appellants have established the requisites for the granting of a preliminary injunction." *Id.*

Here, as in *Mills*, the likelihood that Plaintiffs will succeed on the merits is particularly strong. The Minor Consent Act goes further than any vaccination law any other court has considered. It imposes duties on those who administer vaccines that directly conflict with the duties of the National Vaccine Act. It broadly overrides the consent of both religious and non-religious parents without serving any compelling interest. And the deprivation of such rights is the quintessential example of an irreparable injury.

Additionally, Plaintiffs here face a threat to their rights that is more imminent than the threat posed even in *Mills*. While the *Mills* plaintiffs could not state exactly how they would be harmed, *Mills*, 584 F. Supp. 2d 47 at 63, Plaintiffs here know the Minor Consent Act is depriving them of their rights: The Minor Consent Act, on its face, presents a clear threat to Plaintiffs' decision to decline vaccines.

Defendants are bombarding Plaintiffs' children with a mass media campaign to "take the shot." Defendants have created a pressure cooker environment of direct, state-sponsored peer pressure. Plaintiffs' children are subjected on a daily basis to a carrot-and-stick approach to receive vaccines against their parents' judgment. Plaintiffs and their children have faced pressure from schools to have the children vaccinated. L.B. is very dramatically expressing that he will take the shot if offered it against his father's direct commands.

Whether L.B. or any of the other children "take the shot" or not, the level of pressure

Defendants are placing on Plaintiffs' children is clearly interfering with the parents' fundamental rights and liberty interest to raise their children and the children's right to be raised by their parents.

The Minor Consent Act is designed precisely so that it can be invoked by any doctor's office, clinic, or medical professional at any time, without parents' knowledge. Unless a child self-reports that he has received a vaccine, the parents' constitutional injury may go undiscovered indefinitely. The Minor Consent Act overrides fundamental constitutional rights, in ways that are clear, substantial, and brazen. An injunction from this Court will prevent the irreparable loss of those rights, until such time as the Court can decide its legality. This Court need not wait for Damocles' sword to fall before granting relief. *League of Women Voters*, 838 F.3d at 8-9. The motion should be granted.

## III.    INJUNCTIVE RELIEF WILL FURTHER THE PUBLIC INTEREST.

Finally, a preliminary injunction may be granted when "the balance of equities tips in [its] favor, and . . . an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. at 20. When the government is the opposing party, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "enforcement of an unconstitutional law is always contrary to the public interest" because "the Constitution is the ultimate expression of the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

The Minor Consent Act places an enormous burden on parents. *See League of Women Voters*, 838 F.3d at 12 ("[A]ppellants' extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest"). In stark contrast, enjoining the District from enforcing the Minor Consent Act places no greater burden on the District than those it has borne since 1985, when it originally created the religious exemption.

"While the public clearly has an interest in controlling the spread of disease, the public also has an interest in honoring protections for religious freedom in accordance with the laws passed by Congress." *Capitol Hill Baptist*, 496 F. Supp. at 302-303. Where "the government has failed to show a compelling interest" in applying a law to Plaintiffs, "the public has little interest in the 'uniform application' of the regulations. The public interest instead weighs in favor of the plaintiffs." *Tyndale House Publishers, Inc.*, 904 F. Supp. 2d at 130.

## CONCLUSION

It is impossible to view this case without considering the unique moment of history in which it arises. Vaccines permeate our national discourse in ways that were unimaginable just a few years ago. The hardships of the last two years have made discourse increasingly personal and passionate.

The Minor Consent Act is not a pandemic measure; its scope is far broader than that. Yet even in pandemics, when the necessities of the moment may demand "an energetic response by the political branches to the many uncertainties accompanying the onset of a public health crisis," there comes a time "when a crisis stops being temporary, and as days and weeks turn to months and years, [when] the slack in the leash eventually runs out. 'While the law may take periodic naps during a pandemic, we will not let it sleep through one.'" *Capitol Hill Baptist*, 496 F. Supp. 3d at 297, *quoting Roberts v. Neace*, 958 F.3d 409, 414-15 (6th Cir. 2020) (*per curiam*).

The Minor Consent Act sets the concerns of our time against timeless legal truths: the fundamental right of fit parents to act in the best interest of their children and the freedom to exercise one's sincere religious beliefs without coercion—freedoms that both Congress and the courts have long protected. Those freedoms are now threatened.

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be granted.

40

Respectfully submitted this 14th day of December 2021:


/s James R. Mason III
James R. Mason III
D.C. Bar No. 978781
Parental Rights Foundation
One Patrick Henry Circle
Purcellville, VA 20132
Phone: (540) 338-5600
Fax: (540) 338-1952
E-mail: jim@hslda.org
*Counsel for Plaintiffs*


Robert F. Kennedy, Jr.
Rolf G. S. Hazlehurst
Children's Health Defense
202 Tuckahoe Cove
Jackson, TN 38305
731-267-1663
rolf.hazlehurst@childrenshealthdefense.org
*Entered Pro Hac Vice*