IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____
                                                        )
VICTOR M. BOOTH, *et al*,                               )
                                                        )
                          *Plaintiffs*,                 )
                                                        )
     *vs*.                                              )          **Civil Action No. 21-01857 (TNM)**
                                                        )
MURIEL BOWSER, *et al*,                                 )
                                                        )
                          *Defendants*.                 )
_____               )

**PLAINTIFFS' CONSOLIDATED
MEMORANDUM OF POINTS AND AUTHORITIES
OPPOSING DEFENDANTS' MOTION TO DISMISS/
REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

STANDARDS OF REVIEW ............................................................................................... 5

      A.     Motion to Dismiss for Lack of Subject Matter Jurisdiction. ...................... 5

      B.     Preliminary Injunction. ............................................................................. 5

      C.     Motion to Dismiss for Failure to State a Claim. ........................................ 6

SUMMARY OF ARGUMENT .......................................................................................... 6

ARGUMENT ...................................................................................................................... 11

    I.     The Plaintiffs have standing because the Minor Consent Act and the Defendants' coercive program are current and ongoing, presenting a continuing violation of Plaintiffs' constitutional and statutory rights, continuing pressure on Plaintiffs' children, and an immediate threat of additional harms from the likelihood of secret vaccination of Plaintiffs' children. .................................................................................................. 11

      A.     The Minor Consent Act injures Plaintiffs by depriving them of the fundamental right to direct the upbringing of their children, including medical care. ........................................................................... 14

      B.     The Minor Consent Act injures Plaintiffs by secretly subverting the lawful religious exemptions of parents. .................................................... 19

    II.    The First-Amended Complaint adequately pleads claims upon which relief can be granted and Plaintiffs are likely to succeed on the merits. ........................ 24

      A.     The Minor Consent Act substantially burdens the free exercise rights of parents under the Religious Freedom Restoration Act. ........................ 25

            1.     The Minor Consent Act substantially burdens parents' free exercise rights under RFRA. ....................................................... 25

            2.     The Minor Consent Act is not narrowly tailored. ......................... 27

      B.     The Minor Consent Act violates the free exercise clause of the First Amendment. ........................................................................................... 28

      C.     The Minor Consent Act violates the National Vaccine Act. .................... 29

D.     The Minor Consent Act Violates the Due Process Clause of the Fifth
       Amendment. ........................................................................................... 32

       1.     This Court should reject Defendants' invitation to break new
              ground in substantive due process by placing children on the
              same legal footing as their parents when it comes to routine
              medical decisions. ......................................................................... 33

       2.     The Minor Consent Act does not give special weight to the
              decisions of fit parents, does not further a compelling
              interest, and is not narrowly tailored. ............................................. 36

III.   Absent relief from this Court, the Plaintiffs will continue to suffer
       irreparable, imminent, and redressable injuries. .................................................... 38

IV.    The balance of interests favors the Plaintiffs. The Minor Consent Act
       should be enjoined. ............................................................................................... 42

       A.     Plaintiffs successfully pled Subject Matter Jurisdiction. .......................... 42

       B.     Plaintiffs successfully State Claims upon which Relief may be
              Granted. ..................................................................................................... 43

       C.     Plaintiffs are entitled to the issuance of a Preliminary Injunction. ........... 43

CONCLUSION .......................................................................................................................... 45

# TABLE OF AUTHORITIES

**Federal Cases**

*Aamer v. Obama,*
  742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................5

*Anspach v. City of Philadelphia,*
  503 F.3d 256 (3d Cir. 2007)............................................................................17, 39, 40

*Ashcroft v. Iqbal,*
  556 U.S. 662 ...........................................................................................................6, 24, 43

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).............................................................................................6, 24, 25, 43

*Bonner v. Moran,*
  126 F.2d 121 (D.C. Cir. 1941) .........................................................14, 15, 16, 33, 34

*Calabretta v Floyd,*
  189 F.3d 808 (9th Cir. 1999) ...................................................................................9, 41

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940)...................................................................................................28

*Capitol Hill Baptist Church v. Bowser,*
  496 F. Supp. 3d 284 (D.D.C. 2020) ....................................................................37, 39

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006).................................................................................6, 44

*Citizens for Responsibility & Ethics v. FEC,*
  993 F.3d 880 (D.C. Cir. 2021)...................................................................................21

*Conley v. Gibson,*
  355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)...............................................6, 43

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ..............................................................................6, 44

*De Nolasco v. United States Immigration & Customs Enforcement,*
  319 F. Supp. 3d 491 (D.D.C. 2018) ...........................................................................37

*Doe v. Irwin,*
  615 F.2d 1162 (6th Cir. 1980) ...................................................................................40

*Elrod v. Burns,*
  427 U.S. 347 (1976).....................................................................................................38

*Franz v. United States*,
 707 F.2d 582 (D.C. Cir. 1983) ..................................................................................28, 37

*Haase v. Sessions*,
 835 F.2d 902 (D.C. Cir. 1987) ............................................................................................13

*Jenkins v. McKeithen*,
 395 U.S. 411 (1969) ..................................................................................................6, 43

*Johnson v. California*,
 543 U.S. 499 (2005) ............................................................................................................27

*Kaemmerling v. Lappin*,
 553 F.3d 669, 678 (D.C. Cir. 2008) ....................................................................................26

*Khadr v. United States*,
 529 F.3d 1112 (D.C. Cir. 2008) ............................................................................................5

*Kozup v. Georgetown University*,
 851 F.3d 437 (D.C. Cir. 1988) ............................................................................................15

*Lee v. Wiseman*,
 505 U.S. 577 (1992) .........................................................................10, 12, 14, 40, 41

*Loughlin v. United States*,
 393 F.3d 155 (D.C. Cir. 2004) ......................................................................................5, 42

*Masterpiece Cakeshop, LTD, v. Colorado Civil Rights Commission*,
 138 S.Ct. 1719 (2018) ........................................................................................................29

*Meyer v. Nebraska*,
 262 U.S. 390 (1923) ............................................................................................................34

*Mills v. District of Columbia*,
 571 F.3d 1304 (D.C. Cir. 2009) ............................................................................................38

*Neitzke v. Williams*,
 490 U.S. 319 (1989) ............................................................................................................25

*Nken v. Holder*,
 556 U.S. 418 (2009) ......................................................................................................5, 44

*Parham v. J.R.*,
 442 U.S. 584 (1979) ...........................................................................7, 8, 24, 35, 36

*Pierce v. Society of Sisters*,
 268 U.S. 510 (1925) ......................................................................................................34, 36

*PJ ex rel. Jensen v. Wagner,*
    603 F.3d 1182 (10th Cir. 2010).................................................................14, 15, 34

*Planned Parenthood of Central Miss. v. Danforth,*
    428 U.S. 52 (1976)...................................................................................17, 18

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992)............................................................................................17

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S.Ct. 63 (2020)............................................................................................37

*Scheuer v. Rhodes,*
    416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)................................6, 25, 43

*Settles v. U.S. Parole Comm'n,*
    429 F.3d 1098 (D.C. Cir. 2005) .......................................................................13

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ...........................................................................5

*Sickle v. Torres Advanced Enter. Sols., LLC,*
    884 F.3d 338 (D.C. Cir. 2018) .........................................................................29

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002)..........................................................................................24

*Troxel v. Granville,*
    530 U.S. 57 (2000)..................................................................................14, 33, 36

*Tyndale House Publishers, Inc. v. Sebelius,*
    904 F. Supp. 2d 106 (D.D.C. 2012) .................................................................39

*Van Emrik v. Chemung Cty. Dept. of Social Serv.,*
    911 F.2d 863 (2d Cir. 1990)............................................................................14

*Wallis ex. rel. Wallis v. Spencer,*
    202 F.3d 1126 (9th Cir. 1999) .........................................................................42

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..........................................................................................5, 43

**State Cases**

*Bakker v. Welsh,*
    144 Mich. 632 (1906) .................................................................................34, 35

*Zoski v. Gaines,*
    271 Mich. 1 (1935) ...........................................................................................35

**United States Constitution**

Fifth Amendment ...........................................................................................8, 25, 32, 43
First Amendment .............................................................................................28, 29, 39

**Federal Statutes**

28 U.S.C.

§ 1331 ...........................................................................................................................43
§ 1343 ...........................................................................................................................43
§ 2201 ...........................................................................................................................43

42 U.S.C.

§ 300aa-25(a) ...................................................................................................30, 31, 32
§ 1983 ...........................................................................................................................43
§ 1988 ...........................................................................................................................43
§ 2000bb ......................................................................................................................43

**State Statutes**

D.C. Code

§ 38-502 ................................................................................................................31, 32
§ 38-506(1) ....................................................................................................................1
§ 38-602 ................................................................................................................31, 32
§ 38-602(a)(1) ..............................................................................................................32
§ 38-602(a)(2) ..................................................................................................21, *passim*
§ 38-602(c)(2)(B) .........................................................................................................32
§ 38-602(c)(2)(C) .........................................................................................................32

**Regulations**

22-B DCMR

§ 600 ......................................................................................................................19, 22
§ 600.1 .........................................................................................................................19
§ 600.2 .........................................................................................................................20
§ 600.4 .........................................................................................................................20
§ 600.7 ....................................................................................................................20, 22
§ 600.7(a) .....................................................................................................................20
§ 600.7(c) .....................................................................................................................20
§ 600.9 .........................................................................................................................20
§ 600.9 (d)(1) ...............................................................................................................20
§ 600.9(d)(1)-(2) ..........................................................................................................22
§ 600.9(d)(2) ................................................................................................................21
§ 600.9(e) .....................................................................................................................21

**5-A DCMR**

§ 130.1......................................................................................................32
§ 130.2(m).................................................................................................32
§ 130.4..................................................................................................31, 32
§ 130.4(g).................................................................................................32
§ 130.4(h).................................................................................................32

**5-E DCMR**

§ 5300.2....................................................................................................31

District Regulation No. 74-22 (Aug. 30, 1974) ...............................................22

**Federal Rules of Civil Procedure**

Rule 8(a)(2)............................................................................................6, 43
Rule 12(b)(1)..........................................................................................5, 13
Rule 12(b)(6)..............................................................................................24
Rule 12(h)(3)................................................................................................5

**Internet Citations**

Council of the District of Columbia, Committee on Health, Report on Bill 23-0171,
https://tinyurl.com/4cuty3af (accessed August 14, 2021)..........................................8

*COVID-19 Vaccine Information*, GOVERNMENT OF THE DISTRICT OF COLUMBIA,
Muriel Bowser, Mayor, https://coronavirus.dc.gov/vaccine-information ...............................4

DCPS's "Vaccinations for Students" webpage,
https://tinyurl.com/hfamyt7t ................................................................................12, 13

District of Columbia Municipal Regulations Section 22-B600, Minor's Health
Consent, http://dcrules.elaws.us/dcmr/22-b600.............................................................19, 21

Kipp DC, "2021 Back to School Health & Safety Framework,"
https://www.youtube.com/watch?v=JEhLzQ5ilpo (accessed August 18, 2021).....................13

Kipp DC, "Healthy Operations,"
https://www.kippdc.org/healthy-operations/ (accessed August 18, 2021) ............................13

**Miscellaneous Authorities**

1974 D.C. Stat. Reg. 290–92 ..........................................................................22

National Childhood Vaccine Injury Act of 1986...................................................9

Restatement of the Law of Torts....................................................................15

## INTRODUCTION

The Minor Consent Act (the "Act") is not a "passive" piece of legislation that merely acknowledges the ability of mature minors to take control of aspects of their own medical decision-making. Rather, the Act actively tramples religious rights, and actively subverts the fundamental right of parents to direct the upbringing of their minor children. It both deprives parents of the opportunity to make important medical decisions for their children, and deliberately conceals from them that their children have been asked to consent to vaccinations or have indeed been vaccinated. First Amended Complaint ("FAC") ¶20. The Act specifically targets *religious* parents by deliberately depriving them of essential information about their children's medical care; if parents have received a religious exemption, as have the Plaintiffs, Defendants' policy requires the record of their child having received a COVID-19 vaccine to remain blank, and requires that insurance information that would signal a child's vaccination is kept hidden from those parents. If no religious exemption is on file, then this crucial information is not hidden from parents. FAC ¶23.  In its intent and effect, the Act undermines the Plaintiffs' religious exemptions that are granted pursuant to D.C. CODE § 38-506(1). FAC ¶27.

Plaintiffs filed their FAC after the Court granted Defendants' motion to dismiss the original complaint, without prejudice, to allow Plaintiffs to gather evidence of Defendants' pressure upon student Plaintiffs once the school year commenced.  At that time, the Court remarked, "But as I understand it here, we're just talking about a clinic in the school that is very available to students but is not necessarily something that they're being compelled or even encouraged to go to." Transcript Page 6.  In fact, as evidenced in Plaintiffs' FAC, nothing could be further from the truth; rather, throughout the fall of 2021 and continuing to this day, students have been encouraged and coerced accept the vaccine, practically to the point of compulsion.

Plaintiffs' FAC ¶¶119-293 provides solid evidence of the tactics the district employs to coax and coerce—considerably more evidence than what the Court had before it on the September 2, 2021 hearing on the motion. The FAC alleges the Defendants have created a pressure-cooker environment, resulting in systematic psychological manipulation of minor Plaintiffs to defy their parents, and to cave into the enormous pressure to be injected with a compound that has been authorized for emergency use only. FAC ¶¶72-73.

Among other things, Defendants are enticing the U.S.'s most poverty-stricken students with $51 dollar gift certificates, earbuds, a chance to win 8 $25,000 Scholarships, and 32 iPads (FAC 81.1) in exchange for accepting an experimental vaccine. These financial incentives to the nation's most needy children are far more than simply making a vaccine station available on school grounds; indeed, they are more akin to bribery.

On the subject of coercion, Defendants have repeatedly communicated to parents that all students ages 12 and up who want to participate in school sports programs must be vaccinated. FAC ¶¶ 169, 192, 247, 278.  Students with an approved religious exemption may participate in sports without a vaccination, but must wear a facemask at all times and provide a negative Covid-19 test result on a weekly basis, requirements that are not imposed on students without religious exemptions. FAC ¶118. Five Plaintiffs want to play sports FAC ¶107.

If unvaccinated students come into contact with a person who tested positive for COVID-19, they must quarantine at home for 10 days, even if the person to whom the students come into contact is their teacher. Students who have been vaccinated are not subject to such a 10-day quarantine, despite presenting the same risk of infection or transmission of the virus. FAC ¶¶ 189-190.

In combination with this bribery and peer pressure, a barrage of aggressive messaging that the vaccines are safe, effective, and necessary for a return to normal life all act to create a

2

deeply coercive environment for Plaintiffs. For example, a video featuring Dr. Melissa Clarke promoted by Kipp Academy describes "What you can do safely after vaccination," including such post-vaccination benefits as "Hug others who are vaccinated," "Go out in public," and "Have social gatherings with others who are vaccinated." FAC ¶¶167. The effect of these and other pressure tactics on minor Plaintiffs is detailed in FAC ¶¶119-293.

If illicit drug dealers hang out around school grounds, authorities clean up the perimeter. In this case, it is the Defendants who are the drug dealers, no different from any other 'predator' lurking in the wings on a schoolyard. Except here, the school is paying children to be injected with the dealers' wares, while keeping the encounter secret from the parents.

Worse yet, Defendants have absolutely no problem misrepresenting the vaccines as being safe and effective. The FDA has never made a safety and efficacy determination for the available vaccines for this age group; they are experimental medical products. FAC ¶111. However, Defendants forge ahead. The Emergency Use Authorized vaccines are not FDA-approved for ages 5-15 year olds. Further, the vaccines available to 16 and 17 year old children are also not FDA approved either and are not safe and effective.

Therefore there are two major problems with Defendants' policy:

1) Plaintiffs and other DC children are being lied to; and,

2) They are minors incapable of giving informed consent to an experimental biologic (even if they weren't being lied to).

If Defendants are unaware of the lack of FDA approval of these vaccines, and are unaware that the FDA has not determined them to be safe and effective, this is a case of the blind are leading the blind. It is, however, highly unlikely that the Defendants are unaware of these basic facts about the status of the vaccines and have chosen to misrepresent to students the actual regulatory status and nature of the vaccines.

If the information Defendants provide to impressionable children is misleading, how can there be informed consent?  Defendants and even the FDA itself have no idea of the long-term harms of these experimental biologics. That is why they are not FDA-approved. This is why this is an experiment—an experiment on the children. Does that stop Defendants? No.

Bribery, active and constant coercion, peer pressure, intentional misrepresentations ("safe and effective") combine to create an openly hostile environment for Plaintiffs. The effect on minor Plaintiffs is detailed in FAC ¶¶119-293.

The "mature minor" able to navigate these falsehoods and make a mature decision about vaccinations is a fallacy.  In Defendants' fantasyland of safety and efficacy, bribery and misleading information are used to induce consent, not to inform consensual decision-making.

Mayor Bowser's website fraudulently induces with promises of safety:  "The pediatric dose of the Pfizer vaccine has also been found safe for children 5-11 years old." *COVID-19 Vaccine Information*, GOVERNMENT OF THE DISTRICT OF COLUMBIA, Muriel Bowser, Mayor, https://coronavirus.dc.gov/vaccine-information.  The evidence of undue pressure upon the student body to be injected with an experimental compound, and upon minor Plaintiffs in particular, is clearly shown in the FAC. Yet Defendants act as though the amended pleading is no different from the original and that there is nothing to see here. Defendants are mistaken. Defendants' Opposition rallies behind "post-truth politics" and attempts to ignore the complexities involved to justify an environment where facts are viewed as irrelevant, spewing forth:

"Plaintiffs repeat their failed arguments with added pages of allegations about the "pressures" allegedly felt by their children to get vaccinated, extended discourse about the safety and efficacy of vaccines, disagreement with measures taken to slow the pandemic, concerns about emergency use authorizations, and rhetoric that is irrelevant to their claims." Memo 1.

During the hearing on the motion to dismiss the original complaint, the Court remarked: "First, I think you're right that this school setting is different from some of the cases that the District cites and that there's something potentially more coercive about it that is probably helpful to you here." Transcript Page 5. Plaintiffs couldn't agree more.

## STANDARDS OF REVIEW

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction.

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Plaintiff bears the burden of demonstrating that the court's jurisdiction is proper by a preponderance of the evidence. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). "[S]ubject matter jurisdiction is, of necessity, the first issue for an Article III court." *Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### B.  Preliminary Injunction.

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the Plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (emphasis added). The last two factors merge when the government opposes an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A Plaintiff bears the burden of proving all four prongs of the standard before relief can

be granted. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). *See also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (movant must demonstrate "by a clear showing" that the requested emergency relief is warranted).

### C. Motion to Dismiss for Failure to State a Claim.

The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). Furthermore, the allegations of the complaint must be taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421-422 (1969). "In passing on a motion to dismiss . . . for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

## SUMMARY OF ARGUMENT

As a result of Defendants' actions, the Plaintiffs are suffering ongoing injuries, with additional injuries poised like predators in the wings. Under the auspices of the Act, Defendants are deliberately bribing and pressuring Plaintiffs' minor children to be vaccinated, contrary to their parents' religiously-founded wishes.  The injury from this ongoing coercion is compounded because the Defendants are deliberately withholding from Plaintiffs and other religious parents information about any vaccinations injected into their children, depriving such parents of knowledge that they need in order to observe their children in the days after the vaccinations are administered, and to seek necessary medical care in the event of any vaccine-related adverse

events. Additionally, in the context of the Act, the ongoing bribery and pressure on Plaintiffs'
children to take the vaccine contrary to their parents religious beliefs and wishes, coupled with
the ready availability of the vaccine and the guarantees of secrecy that surround a decision to
take the vaccine, create serious tensions between Plaintiffs' and their children, depriving
Plaintiffs of their fundamental right to direct the upbringing of their children, including by
overseeing their children's medical care. As a result of these current, ongoing injuries, and the
looming injury of actual, secret vaccinations of Plaintiffs' minor children, Plaintiffs have
standing.

Plaintiffs also meet the elements required to obtain a preliminary injunction, and to
survive a motion to dismiss. First, Plaintiffs are likely to succeed on the merits of their various
claims, thus satisfying the first element necessary for a preliminary injunction, and also laying a
solid foundation for defeating a motion to dismiss.  Defendants soft-pedal the Act as a passive
mechanism, which "simply acknowledges the longstanding ability of mature minors to determine
for themselves whether or not to seek certain medical care." Def. Mem. 26. This
mischaracterization of the Act may be more palatable, but it is not what the Act actually does.
"The law's concept of the family rests on the presumption that parents possess what a child lacks
in maturity, experience, and capacity for judgment required for making life's difficult decisions."
*Parham v. J.R.*, 442 U.S. 584, 602 (1979). The Defendants concede this, but argue that
"Plaintiffs' description of [this right] is overbroad," Def. Mem. 26, and that ". . . Plaintiffs again
fail to show any injury is certainly impending." *Id.* at 9.

With respect to Plaintiffs' claims based on religious freedoms under both RFRA and the
Constitution, Defendants' opposition fails because Defendants misapprehend the nature of the
harm caused by the Act. The District generally requires children who attend its schools to be
vaccinated against certain childhood diseases, but it has also created a statutory right whereby

parents have the lawful authority to exempt their children from that requirement on religious grounds. The Act does not revoke the religious exemption, but it secretly divests parents of it. Moreover, the Act publicly and notoriously communicates to children that they may ignore their parents' wishes based on sincerely held religious beliefs, *and* that the District will abet them in doing so—even to the point of hiding the facts from the parents. That harm, which has already occurred in the children's public high schools, will persist as long as the Act remains in effect, and has been exacerbated by the Defendants' recent decision to open vaccine clinics in two of the Plaintiffs' schools.

Try as they might to characterize the Act as passive, the Defendants cannot change the fact that the *primary* purpose of the Act was to actively subvert the lawful religious exemptions the parents have claimed. One need look no further than the opening pages of the District's Committee on Health report, cited extensively by the Defendants, which stated that "Bill 23-0171 is needed to grant minors, who are concerned for their health and safety, protection and the right to consent to a vaccination recommended by US Advisory Committee on Immunization Practices (ACIP) and a trained physician, *despite their parents' refusal of consent or objection to immunization*." Council of the District of Columbia, Committee on Health, Report on Bill 23-0171, at 2, https://tinyurl.com/4cuty3af (accessed August 14, 2021) (emphasis added). The Act was designed to aggressively override the lawful exemptions of parents, and to do so in secret.

With respect to Plaintiffs' Fifth Amendment substantive due process claim, "[t]he law's concept of the family rests on the presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.*, 442 U.S. at 602.  The District offers parents the lawful authority to exempt their children from vaccine requirements on religious grounds with one hand, but surreptitiously strips them of that lawful authority with the other. The loss of this statutory right, and the resulting

8

interference in the parent-child relationship and infringement on parents' authority over their children's medical care, are themselves injuries. As the Ninth Circuit Court of Appeals recognized, "The government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting *children's interest* in the privacy and dignity of their homes and *in the lawfully exercised authority of their parents*." *Calabretta v Floyd*, 189 F.3d 808, 820 (9th Cir. 1999) (emphasis added). The Plaintiff parents have exercised lawful authority to exempt their children. They should be confident that when they make lawful choices on behalf of their minor children, the government will not only respect those choices but will also protect their *children's interests* in the lawfully exercised authority of their parents.

Finally, as noted above, by directing that vaccination of children whose parents have obtained religious exemptions be shrouded in secrecy, the Act conflicts with the National Childhood Vaccine Injury Act of 1986. In so doing, the Act not only violates the Supremacy Clause; it also hinders parents' ability to make risk-assessments prior to vaccination, and hinders their ability to make the timely observations that are necessary both to seek medical care in the event of vaccine-related adverse events and to seek compensation under the National Childhood Vaccine Injury Act.

In the absence of an injunction, Plaintiffs will suffer irreparable injury, in addition to the ongoing injuries to Plaintiffs detailed in the discussion of standing, above.  Further, the Plaintiffs' children are left to navigate these competing forces— between their parents who have claimed a lawful exemption and their school staff, teachers, and peers pressuring them to be vaccinated—in the unique setting of public high schools. As the Supreme Court recognized in *Lee v. Wiseman*, the pressures exerted in this crucible are substantial and coercive. "The *undeniable fact* is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a

group or, at least, maintain respectful silence during the Invocation and Benediction. This pressure, though subtle and indirect, can be *as real as any overt compulsion*." *Lee v. Wiseman*, 505 U.S. 577, 592-593 (1992) (emphasis added). Adults may be able to distinguish between "coercion" and "encouragement," but "for the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, *the injury is no less real*." *Id.* (emphasis added).

While the Plaintiffs do not advance an establishment clause claim, *Wiseman's* observations about the experiences of students in public schools capture exactly the pressures that the Plaintiffs' children have experienced, and will continue to experience as long as the Act remains in effect. This coercion, combined with the parents' ongoing loss of their constitutional and statutory right to exempt their children, are themselves injuries that have occurred, are ongoing, and will only be exacerbated as the Defendants continue their efforts to have all school-age children vaccinated, and open school vaccine clinics to accomplish that goal. These are real injuries, constituting violations of federal law, and they are redressable by this Court.

The final element necessary for a preliminary injunction is met because an injunction would remove the Act's tremendous burden on Plaintiffs and their children, and would place no greater burden on the District than what has existed since 1985, when the religious exemption was created. Thus, an injunction would be in the public interest.

The Defendants' motion to dismiss should be rejected, and the Act should be enjoined.

**ARGUMENT**

I.  **The Plaintiffs have standing because the Minor Consent Act and the Defendants'
    coercive program are current and ongoing, presenting a continuing violation of
    Plaintiffs' constitutional and statutory rights, continuing pressure on Plaintiffs'
    children, and an immediate threat of additional harms from the likelihood of secret
    vaccination of Plaintiffs' children.**

While the Act subverts the lawful exemptions of parents in all places where it applies, the
Plaintiffs have focused primarily on its application in schools because that is where the *current*
injuries are most severe—particularly for the children who attend public high schools—and
because that is where the *future* risk of actually being vaccinated is most likely. Again, from the
beginning, the Act was envisioned as a mechanism to get more children vaccinated, "despite
their parents' refusal of consent or objection to immunization." Committee on Health Report at
2. Even before it was passed, the Council recognized that it could be deployed as a method of
distributing vaccines to children. As Council Member Allen stated, vaccines are "a way that we
not only keep individuals safe but we keep communities safe, and we're certainly going to be
having a conversation sometime next year [2021] when there's another vaccine that's going to be
critically important, that's gonna see widespread distribution and we're gonna want to make sure
that we're taking the right steps." FAC ¶ 35.

Just as Council Member Allen predicted, "next year" has come and the Defendants have
been busily taking those steps. Since the FDA and ACIP expanded the emergency use of the
COVID-19 vaccine for children ages 12-15, FAC ¶ 47, DCPS has upped the ante in the crucible
of schools by stressing the importance of being vaccinated, FAC ¶ 31, and has updated its
immunization policy with an increased focus on "identify[ing] students that are non-compliant"
and disseminating information about "the critical public health need for immunizations," FAC
¶ 53, within the context of the new Act. FAC ¶ 55. This aggressive messaging has already placed
tremendous pressure on the Plaintiffs and their children, FAC ¶¶ 72-85.

The emergency use authorization for the COVID-19 vaccine also coincided with the efforts of DCPS and DC Health to open vaccine clinics in schools. The FDA issued the authorization on May 10, and ACIP recommended it on May 12. FAC ¶ 47. Two days later, Chancellor Ferebee sent an e-mail to all DCPS students, telling them that "**If you want to see students back in school, then it is our responsibility as a community for everyone to receive the COVID-19 vaccine when it's available to them.** We are collaborating with local health officials to host vaccination clinics at our schools. More details are forthcoming." FAC ¶ 89 (emphasis in original).

Defendants dismiss the "peer pressure" the Plaintiffs' children have faced and continue to face, failing to appreciate the "undeniable fact" of just how unique—and coercive—the high school environment can be. *Wiseman*, 505 U.S. at 592-93. Indeed, the central feature of DCPS's "Vaccinations for Students" webpage (https://tinyurl.com/hfamyt7t) is the list of "School Immunization Clinics" operated by the District. At the time the complaint was filed, this list included only four schools. Now, there are twenty. *See* FAC ¶ 59. The site also provides the hours and immunizations offered. Two clinics only administer COVID-19 vaccines (Anacostia High School and Ida B. Wells Middle School), but the remaining eighteen *also* offer childhood immunizations, as well as "other health services." DCPS, "Vaccinations for Students." One of those schools is Hardy Middle School, in Ward 2, where Shameka's child K.G. is enrolled. Hardy Middle School's clinic has been open since August 10, and offers both the COVID-19 vaccine and childhood immunizations. DCPS, "Vaccinations for Students." Before the clinic opened, Shameka was already afraid to send her child back to Hardy, and had already been contacted by her local school to get K.G.'s vaccines up-to-date. Both she and K.G. had already faced pressure to get the vaccine. *Id.* Those fears have only become more concrete since the

complaint was filed, and that fact is entirely attributable to the acts of the Defendants. FAC ¶¶ 208-235.

DCPS and DC Health are *currently* operating and advertising vaccine clinics in at least twenty schools FAC ¶59, and at least of two of those clinics operate at a school where the Plaintiffs' children attend—exactly as the Plaintiffs predicted.[1] Because the Defendants have raised a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the Court may consider materials outside the pleadings "to assure itself of its own subject matter jurisdiction," *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005), *quoting Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987), and must construe the complaint liberally to afford all possible inferences favorable to the pleader on allegations of fact. *Settles*, 429 F.3d at 1106. The complaint, combined with the materials beyond the pleadings cited by the Defendants—in particular, DCPS's "Vaccinations for Students" webpage—place the Court's subject matter jurisdiction on firm ground.

Whether the Plaintiffs' children will actually be vaccinated overlooks the fact that the injury of a child actually receiving a vaccine over the parent's objection would be *in addition to* the injuries that come from depriving the Plaintiffs of their constitutional and statutory rights to exempt their children from vaccines in the first place, as well as the injury that comes from the Defendants exerting pressure on the children to be vaccinated, which is "as real [to them] as any

---

[1]     We note in passing that while the Kipp DC Will Academy is not included on DCPS's list of walk-in school clinics, the school's "Healthy Operations" webpage states that "We encourage all staff and eligible students to take the COVID vaccine. *In the coming weeks, we'll be hosting COVID Vaccine clinics at our schools to increase access to our communities.*" Kipp DC, "Healthy Operations" https://www.kippdc.org/healthy-operations/ (accessed August 18, 2021) (emphasis added). The same message is repeated in a video published on Kipp DC's official YouTube channel on July 23, 2021. *See* Kipp DC, "2021 Back to School Health & Safety Framework," https://www.youtube.com/watch?v=JEhLzQ5ilpo (accessed August 18, 2021). Victor and Shanita have children who attend Kipp DC. FAC. ¶¶ 1, 3.

overt compulsion" would be. *Wiseman*, 505 U.S. at 592-93. *Those* injuries have already occurred, are ongoing, and are sufficient to establish standing.

Not only does the Act take active steps to encourage children to receive vaccines (including actively hiding a child's decision from his or her parents), but the District's subsequent actions—most notably, its decision to open vaccine clinics in DCPS schools since the complaint was filed, including the schools of at least two Plaintiffs—has made the threat of actual vaccination far more likely (while intensifying the other ongoing injuries). Any of these injuries are sufficient to confer standing.

### A. The Minor Consent Act injures Plaintiffs by depriving them of the fundamental right to direct the upbringing of their children, including medical care.

Parents have a fundamental right to direct the "care" of their children, including the right to direct to medical treatment in non-emergency circumstances. Defendants principally argue that Plaintiffs seek protection from un-enumerated, and expanded definitions of substantive due process. Def. Mem. 25. However, while some parental rights may not be as settled as the Defendants would like, the right at play in this case is clear:  "[t]he interest of parents in the care, custody, and control of their children," "perhaps the oldest of the fundamental liberty interests recognized by this Court," *Troxel v. Granville*, 530 U.S. 57, 65 (2000), includes a "right to make decisions about the child's medical care." *PJ*. As the Second Circuit has held, "the constitutional liberty interest of parents in the 'care, custody, and management of their child,' though not 'beyond limitation,' includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children." *Van Emrik v. Chemung Cty. Dept. of Social Serv.*, 911 F.2d 863, 867 (2d Cir. 1990). The Defendants' reliance on two "mature minor" cases – *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182 (10th Cir. 2010) and *Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941)—is misplaced. While *PJ* did say that "[t]he Supreme

Court has . . . never specifically defined the scope of a parent's right to direct her child's medical care," *PJ*, 603 F.3d at 1191, the Defendants have ripped that quote out of context. More fully, the Tenth Circuit said that "although we have never specifically recognized or defined the scope of a parent's right to direct her child's medical care, we do not doubt that a parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right to make decisions about the child's medical care." *PJ*, 603 F.3d at 1197 (emphasis added). Moreover, "[t]he Supreme Court has similarly alluded to, but never specifically defined the scope of a parent's right to direct her child's medical care. Indeed, the Court has recognized that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning . . . their need for medical care or treatment," and that our legal system presumes "that natural bonds of affection lead parents to act in the best interests of their children." *Id. Therefore*, this precedent reasonably suggests that the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care. *Id.* (brackets and ellipses in original, internal citations omitted).

Similarly, Defendants cite *Bonner* for the proposition that history and tradition confirm a "right of mature minors to consent to medical care." Def. Mem. 27, citing *Bonner*, 126 F.2d at 122. Nothing on that page—or in *Bonner* as a whole—supports their position. In fact, a third "mature minor" case cited by Defendants (which actually involved an infant) described the Bonner passage as "dicta." *Kozup v. Georgetown University*, 851 F.3d 437, 439 (D.C. Cir. 1988).

*Bonner's* actual holding began with "the general rule "that the consent of the parent is necessary for an operation on a child." *Bonner*, 126 F.2d at 122 (citing authorities in Michigan, Texas, Oklahoma, West Virginia, and Massachusetts). The issue was "whether the consent of a boy 15 years of age dispenses with the necessity of consent by his parents." *Id.* The trial court decided it did, relying on a passage from the Restatement of the Law of Torts that said, "if the

child is capable of appreciating the nature, extent, and consequences of the invasion, his assent prevents the invasion from creating liability, even though the assent of the parent is expressly refused." *Id.*

The Court of Appeals reversed the trial court's decision in *Bonner*, expressing skepticism about the Restatement, which was "bottomed on the principle that the very nature of rights of personality is freedom to dispose of one's own person as one pleases." *Bonner*, 126 F.2d at 123. Even if there were such a rule, the trial court "overlook[ed] the infancy exception to such a rule. In deference to common experience, there is general recognition of the fact that many persons by reason of their youth are incapable of intelligent decision, as the result of which public policy demands legal protection of their personal as well as their property rights." *Id.* at 122. The "universal law" was that minors could not be held liable on personal contracts, contracts for the disposition of property, or to marry without the consent of their parents. "Hence, it is not at all surprising that, generally speaking, the rule has been considered to be that a surgeon has no legal right to operate upon a child without the consent of his parents or guardian." *Id.* (emphasis added). *Bonner* acknowledged some exceptions to this rule, but none of them help the Defendants or apply to the Plaintiffs' children: "cases of emergency, when obviously an operation is necessary," "cases in which the child has been emancipated, or where the parents are so remote as to make impracticable the obtaining of their consent in time to accomplish proper results." *Id.* But even "in all such cases," the Court critically held, "the basic consideration is whether the proposed operation is for the benefit of the child and is done with a purpose of saving his life or limb." *Id.* at 123. In other words, the situations where children can consent to medical treatment on their own are the exception, not the rule; and those exceptions require that the treatment in question be necessary to save the child's life or limb.

Defendants also rely heavily on abortion cases like *Planned Parenthood of Central Miss. v. Danforth*, 428 U.S. 52 (1976), which it cites for the proposition that "Plaintiffs' asserted broad right to control their children's medical care has been squarely rejected by the Supreme Court." Def. Mem. 27. But while it is true that *Danforth* struck down the portion of Missouri's abortion statute that required "the written consent of a parent or person *in loco parentis*" of the woman was under the age of 18. *Danforth*, 428 U.S. at 72, the Court did *not* reject the time-honored role that parents have over their children's medical care. Instead, it applied an interest-balancing approach. And the interest-balancing that occurs in an abortion case is unique, because where conflicts occur in those cases, they pit the fundamental rights of parents against the equally-fundamental right of the child over her pregnancy. Since neither right is absolute, they have to be weighed against each other, and that weighing occurs within the factual context of each case. *See Danforth*, 48 U.S. at 60-61 (noting that *Roe* "emphatically rejected . . . the preferred argument' that the woman's right is absolute . . ."), *id.* at 75 (noting that "[m]inors, as well as adults, are protected by the constitution and possess constitutional rights").

The lesson is simple: where that fundamental conflict arises, those competing interests must be balanced against each other. *Anspach v. City of Philadelphia* involved the same competition—and weighing—of these two rights that the Supreme Court has deemed fundamental, and that fact colored the rest of the Third Circuit's opinion. *See Anspach v. City of Philadelphia*, 503 F.3d 256, 261 (3d Cir. 2007) ("parental interests must be balanced with the child's right to privacy, which is also protected under the Due Process Clause"). And of course, that approach featured prominently in *Danforth*'s successor. *See Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) (holding that because "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right," courts should determine whether "state regulation imposes an undue burden on a woman's ability to make this decision").

*Danforth* did not "reject" any parent's "broad right to direct their children's medical care." Def. Mem. 27. Rather, it held that Missouri's statute failed the interest-balancing test by infringing on the fundamental rights of women in a specific, particular way—imposing "a blanket provision" that gave parents "an absolute, and possibly arbitrary, veto," "regardless of the reason for withholding the consent." *Id.* at 74.

Here, the Act falls prey to the same design flaws that doomed the statute in *Danforth*: it, too, eschews any sort of interest balancing. As much as the Defendants protest now, one of the Act's express purposes was "to grant minors, who are concerned for their health and safety, protection and the right to consent to a vaccination recommended by US Advisory Committee on Immunization Practices (ACIP) and a trained physician, *despite their parents' refusal of consent or objection to immunization*." Health Committee Report at 2 (emphasis added). To accomplish that purpose, the District enacted a "blanket provision," that gives "an absolute, and possibly arbitrary, veto," "regardless of the reason for withholding the consent." *Danforth*, 428 U.S. at 74. True, it is the parent's decision that gets the veto instead of the child's; but that is a difference of application, not substance.

Nor does the Act engage in this interest-balancing in a realm of decision-making where children stand on equal footing with their parents, or even where the interests of parents are arguably weaker. The Act does not cover abortion-related procedures. Nor is it limited to circumstances where the life or health of the child is at risk. On the contrary, if the person administering a vaccine believes the child is "mature," and can provide "informed consent," the vaccine can be administered, full-stop. The parents' wishes—which, for children whose parents have filed a religious exemption, are actually *known* to the District—do not factor into the equation at all. There is no interest balancing, no weighing of interests, only a blanket override.

**B.  The Minor Consent Act injures Plaintiffs by secretly subverting the lawful religious exemptions of parents.**

The purpose of the Act, from the very beginning, was to provide a legal mechanism for overriding the objections of parents, and to do so without the parents finding out. This is evident from the Committee on Health's initial report, which stated that "Bill 23-0171 is needed to grant minors, who are concerned for their health and safety, protection and the right to consent to a vaccination recommended by US Advisory Committee on Immunization Practices (ACIP) and a trained physician, *despite their parents' refusal of consent or objection to immunization*." Committee on Health Report at 2 (emphasis added). In intent and affect, the Act uniquely affects, and injures, families like Plaintiffs' that have obtained religious exemptions.

The Act created a mechanism by which the lawful exemptions of parents like the Plaintiffs could be subverted, easily, and in secret. Section 2 creates a new category of medical decisions over which the child's parents can exercise absolutely no direction. If an eleven-year-old child "consents" to receive a non-FDA approved vaccine, even if the child's parent has expressly *refused* to consent—the vaccine can be administered, and the fact of the vaccination will be hidden from the parent. Nothing more is required; that is the end of the matter.

Notably, as an initial matter, none of the other provisions of District of Columbia Municipal Regulations Section 22-B600. Minor's Health Consent [see link http://dcrules.elaws.us/dcmr/22-b600] 22-B DCMR § 600, *et seq.*, allow children "of any age" to consent to medical treatment in the absence of an emergency or heightened constitutional protections related to reproductive rights, and no other provisions require hiding the fact of treatment from religious parents.  Rather, the default rule, established in 22-B DCMR § 600.1, is that persons who are "eighteen (18) years of age or older may consent to the provision of services for himself or herself." Of the exceptions to this rule about the age of consent, one is

19

limited to minors who are "seventeen (17) years of age," and does not involve "medical

treatment." *See* 22-B DCMR § 600.2 (voluntary blood donations to nonprofit organizations).

Two of the four exceptions in 22-B DCMR § 600.7 fall within the realm of reproductive health,

where minors have heightened constitutional protections. *See* 22-B DCMR § 600.7(a)

("pregnancy or its lawful termination"); 22-B DCMR § 600.7(c) ("prevention, diagnosis, or

treatment" for a "sexually transmitted disease"). And the remaining exceptions all involve

*emergency* circumstances, where the life or health of the child is in danger. *See* 22-B DCMR

§ 600.4.

The lone exception is 22-B DCMR § 600.9—the Minor Consent Act itself. It is the only

provision where there is no requirement of emergency or harm to the child, and the medical

decision itself is not in a special constitutional category. On the contrary, the Act applies to

"any" "minors who want to receive vaccines and who are capable of providing informed consent

themselves," "regardless of their parents' fitness or beliefs," and regardless of whether they

"could not previously obtain such vaccines because of their parents' objections or simply

because of logistical difficulties." Def. Mem. 32. And, of course, there is no underlying

emergency of the kind that would otherwise justify medical care in the absence of parental

consent.

The fact that the Act divests parents of their constitutional and statutory rights in secret

compounds the injury. There are at least four provisions of the Act that overtly do this, and these

directly contradict Defendants' assertions that the Act is merely "permissive," *see* Def. Mem.

n.5.

First, subsection 22-B DCMR § 600.9 (d)(1) states that "Providers who administer

immunization under the authority of this subsection *shall* seek reimbursement, *without parental*

*consent*, directly from the insurer . . ." (emphasis added).

Second, subsection (d)(2) further directs that "Insurers *shall not* send an Explanation of Benefits for services provider." 22-B DCMR § 600.9(d)(2) (emphasis added). The Defendants, in passing, liken the *effect* of these sections to HIPPA, *see* Def. Mem. 24, but otherwise do not defend them.

Next, the third provision, codified in D.C. CODE § 38-602(a)(2), contains several mandates: health care providers *shall* submit the immunization records directly to the school, while leaving part 3 of that record blank, and schools *shall* keep the immunization record confidential. These are not "permissive" provisions; they are compulsory. *See, e.g., Citizens for Responsibility & Ethics v. FEC*, 993 F.3d 880, 892 (D.C. Cir. 2021) (distinguishing the "mandatory 'shall'" from the "discretionary 'may'"). And they were *designed* to be compulsory. *See* Committee on Health Report at 3; The Defendants argue that "part 3 of the immunization record" refers to the DC Health Universal Health Certificate, which they distinguish from a person's "permanent medical record." Def. Mem. 22-23. That argument misses the point. Either way, the Universal Health Certificate is a record of medical information about a child that the District has *mandated* be kept from that child's parents.

Finally, subsection (e) states that "A minor who receives services provided under the authority of this subsection *shall* have access to the minor's immunization records *without parental consent*." 22-B DCMR § 600.9(e) (emphasis added). The contrast between how the Act treats children, and how it treats their parents, could not be starker: minors get information, their parents do not.

The Defendants' rejoinder is: the Act was not intended to "overrid[e] parents' decisions to decline childhood vaccines based on sincere religious beliefs"; rather, it is aimed at minors who want to receive vaccines and who are capable of providing informed consent themselves, and applies to any of those individuals, regardless of their parents' fitness or beliefs. Memo 32.

21

Defendants cite District Regulation No. 74-22 (Aug. 30, 1974), 1974 D.C. Stat. Reg. 290–92, and 22-B DCMR §§ 600, 600.7. "[T]he Act," they suggest, "can be constitutionally applied to at least help competent minors whose only impediment to vaccination before the Act went into effect was the logistics of getting to the doctor *with* their parents to obtain desired vaccines. Now they can do it on their own." Def. Mem. 15.

Perhaps someone has adopted a law designed to accomplish that goal, but that someone is not the District and that law is not the Act. Nothing in the text limits the Act's sweep to that scenario, or suggests it was ever intended to be so limited. Indeed, entire subsections of the Act make no sense in the Defendants' hypothetical context. If a parent *wants* their child to obtain a vaccine, and the "only impediment" is the "logistics of getting to the doctor *with* their parents," one would *expect* that the parent should be told, so that the parent—whose life in this hypothetical is filled with "competing priorities," *id.* at 15 n.5—could watch for potential side effects, avoid scheduling an appointment for a duplicative vaccine, and could rectify any billing issues with the provider and insurance. But of course, the Act does exactly the opposite. It expressly *bars* the parent's insurer from sending an explanation of benefits to the child's home. 22-B DCMR § 600.9(d)(1)-(2). It is a blanket bar, too: it applies in every circumstance, even the Defendants' hypothetical.

Nor does the Defendant's hypothetical explain Section 3 of the Act. If a parent *wants* their child to be vaccinated, it is unlikely that he or she would have a religious exemption on file (and if they did, it would be a simple matter for the parent to revoke it). But there are parents whose "minor student[s] [are] utilizing a religious exemption for vaccinations or is opting out of receiving the Human Papillomavirus vaccine," and if those students receive a vaccine under the Act, the District has *mandated* that "the health care provider shall leave blank part 3 of the immunization record," and that the "school shall keep the immunization record . . . confidential."

D.C. CODE § 38-602(a)(2). The Defendants' hypothetical has no bearing on that provision, nor does it show how that provision has a "plainly legitimate sweep." Def. Mem. 15.

It Is clear, then, that Defendants' acts are intentional in their effects on the children of parents who have received religious exemptions. The primary purpose of the Act, from the beginning, was to subvert the lawful exemptions of parents. Not telling parents that their children have received a vaccine—by providing them with an Explanation of Benefits, a notation in the child's permanent health record, or a "confidential" Universal Health Certificate—furthers that goal. That is why the executive suggested that the Council amend the bill to prevent situations where "a third-party payer would lead to a guardian or parent being notified of the vaccination via an Explanation of Benefits," Committee on Health Report at 3, and why the Council acted on that suggestion. The Act is designed to keep parents in the dark, and well-designed to accomplish that goal. It has injured and is injuring both the Plaintiffs and their children. "Shockingly, Defendants shroud the process in secrecy by instructing insurers to conceal children's vaccination information from parents as payors. Defendants have covered all bases to deceitfully hide this vital information from parents and to obstruct their ability to serve as dutiful and effective caregivers." FAC Page 1.

In sum, "the *real* goal of the Act is not to react to a global pandemic, but to bypass the decisions of religious parents who object to *any* ACIP-recommended vaccines, whether pre- or post-pandemic." Pl. Mem. 27. With one hand, the District has given parents the lawful authority to exempt their children from vaccinations. On the other hand, it has publicly and notoriously communicated to children through the Act that they may ignore their parents, and that the District will abet them in doing so—even to the point of hiding the facts from the parents. The harm is not exclusively caused by a vaccination at the end of the "chain of events" listed by the Defendants, Def. Mem. 10 (although that would of course *further* injure them); the harm has

already been caused by authorizing parents to exempt their children on the one hand, then abrogating that lawful right on the other hand. That harm has already occurred, is ongoing, and will only be exacerbated at each of the steps listed by Defendants.

Parents are suited to counsel their children because they "possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham*, 442 U.S. at 602. Their contribution cannot be discarded so lightly. Nor should it. The Defendants present the Act as a purely passive force. It may "authorize[] healthcare providers to provide a service under certain circumstances," but they contend it "does not require Plaintiffs or their children to do anything," Def. Mem. 2 This mischaracterizes the Act. The Act was intended to subvert parents' lawful exemptions; it was designed to subvert them in secret; and it has, is, and will continue to do so unless this Court intervenes.

## II.   The First-Amended Complaint adequately pleads claims upon which relief can be granted and Plaintiffs are likely to succeed on the merits.

The Defendants urge this court to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), arguing that it does not state a claim upon which relief can be granted. Defendants similarly argue that Plaintiffs are not entitled to a preliminary injunction in part because success on the merits of Plaintiffs' claims is unlikely. Def. Mem. 7. While the previous arguments as to standing rebut much of this claim, we address each of the particular claims below.

As the Defendants note in passing, Def. Mem. 8, the analysis is guided by two important rules. First, while this Court is "not bound to accept as true a legal conclusion couched as a factual conclusion," *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556, it "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). Second, at this early stage the claim to relief need only be "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. at 678. Rule 12(b)(6) "does not countenance . . . dismissals based on

a judge's belief of a complaint's factual allegations," and a well-pled complaint "may proceed even if it appears 'that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556, *quoting Neitzke v. Williams*, 490 U.S. 319, 327 (1989) *and Scheuer v. Rhodes*, 416 U.S. at 236. The complaint is well-pled.

### A. The Minor Consent Act substantially burdens the free exercise rights of parents under the Religious Freedom Restoration Act.

#### 1. The Minor Consent Act substantially burdens parents' free exercise rights under RFRA.

The Defendants' memorandum identifies only one allegation as a "legal conclusion cast as a factual allegation": the "Plaintiffs' characterization that the potential for their child to receive a vaccine against their wishes is a 'substantial burden.'" Def. Mem. 37, *citing* Pl. Mem. 31. This objection is easily dealt with. Setting aside the fact that the citation is to the Plaintiffs' memorandum of points and authorities (not their complaint),[2] and deals with the Plaintiffs' Fifth Amendment claim (not whether there is a "substantial burden" under RFRA), the language complained of does recount the specific factual allegations in the complaint that form the basis of their legal arguments: "Victor, Shameka, Shanita, and Jane are all fit parents." "They have used their own maturity, experience, and capacity for judgment to decide whether to vaccinate their children." "They have decided that vaccinating their children would be contrary to their sincere religious beliefs." "And they have expressed that decision to the District by filing a religious exemption, which they have a statutory right to do. . . ." These factual predicates supported their legal conclusion: "As fit parents, the Fifth Amendment presumes that their decisions are in the best interests of their children. The Act takes the opposite approach. . . ." Pl. Mem. 32.

That said, the complaint contains sufficient *factual* allegations for their other claims, too. The *current and ongoing injuries* that give the Plaintiffs standing are also "substantial burdens"

---

[2]     *Twombly* applies only to legal conclusions in a complaint. *Twombly*, 550 U.S. at 556.

under RFRA. "The District has recognized a legal right of parents to claim a religious exemption from vaccinations, by filing an objection in good faith and in writing a statement . . . that vaccinations would violate the parent's religious beliefs." FAC ¶ 382. The Act did not eliminate the religious exemption. *Id.* at ¶ 315.

Once one pairs them *with* legal conclusions, the substantial burdens become clear. Creating an exemption for parents who have sincere religious beliefs about vaccines, and then designing a mechanism to secretly subvert the same parents who claim that exemption, inflicts more than a "*de minimis* inconvenience[]." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008). Indeed, the entire reason these parents object to the Act is precisely *because* they have a religious exemption, and that puts them in a different position *vis-à-vis* the Act from any other category of parents. Parents whose children already have all the vaccines recommended by ACIP have nothing to fear. Nor does the Act infringe on the hypothetical parents Defendants have proposed: those who don't object to vaccines, but whose lives are filled with too many "competing priorities" to accompany the child to the doctor. Def. Mem. 16 n.6. Parental consent is a non-factor for children who are abandoned or orphaned. Parents who object to vaccines, but choose not to claim an exemption, may eventually have to make that choice; but until they do so, their decision has not been challenged and devalued like the Plaintiffs' decisions have been. Even parents with medical exemptions are treated differently: their decisions are not "singled out," nor are they "targeted" like parents who claim a religious exemption or an HPV exemption. *See* Pl. Mem. 2, 34, *citing* D.C. CODE § 38-602(a)(2). The Act uniquely burdens only one subset of parents: the parents who file exemptions. It has already exerted "substantial pressure on [the Plaintiffs and their children] to modify [their] behavior and to violate [their] beliefs," *Kaemmerling*, 553 F.3d at 678, and that pressure is only increasing. *See* FAC ¶¶ 103-105, 83, 89, 99-101; Pl. Mem. 4-5.

### 2.   The Minor Consent Act is not narrowly tailored.

The generalized interests invoked by the Defendants create an additional problem. If the Act was truly aimed at "prevent[ing] the spread of communicable diseases"—or even "stemming the spread of COVID-19,"—as opposed to subverting the lawful exemptions of parents, there are myriad ways to accomplish the former without destroying the latter.

Over the last year, we have become more aware of and comfortable with technology like online video conferencing, "telemedicine," and encrypted technologies for transmitting sensitive documents that allow us to accomplish tasks remotely that we would normally have done in person. Any of them could have been used to make it easier for parents *to consent to the vaccines they want* (if they can't accompany their child in person to the doctor's office, for example), without stripping them of their right to exempt their children from vaccines they do *not* want.

The Defendants' memorandum is light on this point. While the phrase "narrowly tailored" appears several times, they make only two substantive arguments. First, they chide the Plaintiffs for "provid[ing] no reasoned basis . . . for how a fitness determination would operate as a 'reasonable way' for the District to achieve the stated goals of the act 'with a lesser burden on constitutionally protected activity.'" Def. Mem. 32, *citing* Pl. Mem. 39-40. Setting aside the fact that under strict scrutiny, the *government* has the burden of proving its measures are narrowly tailored to further compelling governmental interests (not the Plaintiffs), *see Johnson v. California*, 543 U.S. 499, 505 (2005), it seems reasonable to believe that the suggestions outlined above would help alleviate the burden on parents whose lives are filled with "competing priorities." Def. Mem. 15 n. 5. After all, the District has adopted and used many—if not all—of the measures outlined above. Surely it is not unreasonable to suggest that they might contain viable alternatives to accomplishing the legitimate goals of the Act, without violating anyone's religious beliefs.

The Defendants' second argument is that the law *is* narrowly tailored, because it is restricted to a discrete "class of person" ("minors who are 'able to comprehend the need for, the nature of, and any significant risks ordinarily inherent in the medical care'"), while excluding other discrete classes of persons (such as minors who are "incapable" of appreciating those needs or risks). Def. Mem. 33. It is true that the District could have drawn the Act more broadly. But that is true of almost any law—and it is *not* what makes a law "narrowly tailored." Rather, as the D.C. Circuit noted in *Franz v. United States*, 707 F.2d 582 (D.C. Cir. 1983), the essence of the "narrowly tailored" analysis is that "[i]f there are other, reasonable ways to achieve those goals *with a lesser burden on constitutionally protected activity*, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" Pl. Mem. 35, *quoting Franz*, 707 F.2d at 607 (emphasis added).

Yes, extending the Act to *all* minors without the language about informed consent would broaden its scope, while restricting the Act to minors who are 17 years old or above would limit it. But however the scope of the law changes, the Act would still *burden* the *constitutionally protected activity* at issue by preventing the parents of those children—whoever they may be— from lawfully exempting them from vaccines. The medical and technical alternatives suggested above are "narrow" in this sense: they are directed to the same compelling interests raised by the Defendants, while avoiding the burdens imposed by the Act. The Act is not narrowly tailored.

**B.  The Minor Consent Act violates the free exercise clause of the First Amendment.**

The First Amendment's free exercise clause clearly applies to state and local governments. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).  The Act is unconstitutional on its face.  Specifically, the Amendment to D.C. CODE § 38-602(a)(2) states: "if a minor is utilizing a religious exemption for vaccinations…the health care provider shall leave blank part 3 of the immunization record."  This part of the Act specifically targets children whose parents have

claimed a lawful religious exemption. This is directly contrary to the religious neutrality the Constitution requires. "The Constitution commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their high duty to the Constitution and to the rights it secures." *Masterpiece Cakeshop, LTD, v. Colorado Civil Rights Commission*, 138 S.Ct. 1719, 1731 (2018) (internal citations omitted).

The State has a "duty under the first amendment not to base laws or regulations on hostility to a religion or a religious viewpoint." *Masterpiece Cakeshop*, 138 S.Ct. at 1721, yet this is exactly what the Act does. As the Supreme Court explained in *Masterpiece Cakeshop*, the government's "hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Id.* The Act is not neutral towards religion. On the contrary, it specifically targets parents and children in families that have exercised lawful religious rights.

In essence, the Act commands that if a parent files a lawful religious exemption from vaccinations for her child, then not only is her religious exemption ignored, but also the protections of the National Vaccine Act are stripped away. The Act is clearly hostile to religion, because whether the vaccination record is left "blank" is based solely on the existence of the parents' religious exemption. The Act clearly violates the First Amendment by targeting parents because they have exercised their lawful, religious rights.

### C.  The Minor Consent Act violates the National Vaccine Act.

The Act also conflicts with the National Vaccine Act. Federal law preempts lower law when "the operation of federal and state law clash in a way that makes 'compliance with both state and federal law . . . impossible,'" or when a law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Sickle v. Torres*

*Advanced Enter. Sols., LLC*, 884 F.3d 338, 347 (D.C. Cir. 2018). The Act does both. It contains counter-mandates that make compliance with both federal law and District law impossible, and these counter-mandates thwart the primary purpose of the Act primary purpose. When it comes to limiting the risk of unavoidable vaccine injuries, parents are the front-line of defense. The Act was designed to deprive parents of access to accurate medical information, and any meaningful opportunity to assess the risks before their child is vaccinated. This does not decrease the risks for children; it increases them.

The Act thwarts Congress's purposes by mandating the creation of inaccurate health records, while barring parents from accessing accurate records. We begin, briefly, with familiar ground: the Act mandates that if vaccines are administered to the children of parents who have a lawful religious exemption, "the health care provider shall leave blank part 3 of the immunization record," and the "school shall keep the immunization record . . . confidential." D.C. Code § 38-602(a)(2) (emphasis added); *see also* FAC ¶¶ 25, 56, 320, 375; Pl. Mem. 16-17. Both provisions, like the ban on sending parents an explanation of benefits, further the District's primary goal of subverting the lawful exemptions of parents by erecting barriers to prevent them from discovering that their children have been vaccinated. *See* Committee on Health Report at 2.

Both provisions also conflict with 42 U.S.C. § 300aa-25(a), titled "Recording and Reporting of Information." Beginning with the "leave blank" requirement, Congress has mandated that "[e]ach health care provider who administers a vaccine set forth in the Vaccine Injury Table to any person shall record, or ensure that there is recorded, in such person's permanent medical record (or in a permanent office log or file to which a legal representative shall have access upon request) with respect to each such vaccine" its "date of administration," its "manufacturer and lot number," the name, address and title of the provider administering the

vaccine, and "any other identifying information on the vaccine" required by the Secretary's regulations. 42 U.S.C. § 300aa-25(a) (emphasis added). In other words, the record cannot be left blank.

The Defendants' response is that Congress was talking about "permanent medical records," while the Act refers to a portion of "the DC Health Universal Health Certificate." Def. Mem. 22, citing D.C. CODE § 38-502 and 5-A DCMR § 130.4. One page later, they argue that the "immunization record" to be left "blank" in D.C. CODE § 38-602 also refers to the "Universal Health Certificate." *Id.* Since "permanent medical records" and the Universal Health Certificate are "different systems entirely and do not overlap," *Id.*, the Defendants see "no conflict at all" between the Act and the National Vaccine Act. *Id.* at 23.

Defendants also cite, without explanation, 5-E DCMR § 5300.2, which deals with free appropriate public education (FAPE) for children with disabilities. Def. Mem. 22.

On the contrary, they argue, "the Act does not prohibit providers from recording certain information in patients' medical records" (although the Defendants cannot quite bring themselves to say that parents could access the child's permanent records). *Id.* at 12, 22.

This dodge is too clever by half. As an initial matter, whether the "immunization records" to be left blank are a "permanent medical record," part of the "Universal Health Certificate," or both, is not resolved by the sources the Defendants cite; whether these documents are the same or distinct is, at best, ambiguous. But even if the Defendants were correct, the reach of the National Vaccine Act is not limited to just "permanent medical records." "Permanent medical records" cannot be left blank, but neither can "permanent office log[s]," or a "file to which a legal representative shall have access to." 42 U.S.C. § 300aa-25(a).

The Defendants cite to 5-A DCMR § 130.4, presumably to bolster their claim that the Universal Health Certificate is a distinct record (even though the regulation does not explicitly

say that). But the form described in that section sounds a lot like a "permanent office log." Licensees are to "maintain a record for each enrolled child" in "one central location at the Facility," 5-A DCMR § 130.1, which contains among other things "health information and records," 5-A DCMR § 130.2(m), and a "[c]hild's significant health history." 5-A DCMR § 130.4(g). Critically, this record must also contain "specific immunizations received by month, day, and year," 5-A DCMR § 130.4(h), and must be made "immediately available to . . . the child's parents . . . upon request." 5-A DCMR § 130.1. The National Vaccine Act explicitly applies to all "file[s] to which a legal representative shall have access to."

D.C. CODE § 38-602 uses the term "immunization record," but that term only appears in subsection (a)(2), which was created by the Act. The preexisting sections used a different term— "certificate of health"—which fits the Universal Health Certificate. C.f. Dock. 16-3 with D.C. CODE § 38-602(a)(1) (designed for school-age children), D.C. CODE § 38-602(c)(2)(B) (completed by licensed medical professional), and D.C. CODE § 38-602(c)(2)(C) (includes information for accessing health insurance and contacting school nurses). D.C. CODE § 38-502 further complicates matters by introducing a third term: "certification of immunization." None of these terms are defined. 42 U.S.C. § 300aa-25(a). If the Universal Health Certificate and the record in 5-A DCMR § 130.4 are one and the same, then even the District's Certificate is subject to the National Vaccine Act, cannot be left blank, and must be accessible by the child's parents. The Act mandates otherwise, creating an irreconcilable conflict.

### D.  The Minor Consent Act Violates the Due Process Clause of the Fifth Amendment.

The Act fails strict scrutiny under the Fifth Amendment for the same reasons it fails under RFRA: the "compelling interests" put forth by the Defendants are far too general, the Defendants make no effort to show how those general interests justify application of the Act to

the specific Plaintiffs, and there are myriad alternatives to accomplish those general interests without stripping parents of their lawful authority to exempt their children from vaccines. These demands are not mere surplusage. There is a reason why *Troxel* requires—as a constitutional minimum—that the state afford "special weight" to the determinations of parents, *see* Pl. Mem. 34, and why both this Court and the D.C. Circuit apply the heightened strict scrutiny to violations of parental rights. *See* Pl. Mem. 35. It is to ensure that the government, which does not stand on the same footing as fit parents, cannot override a parent's decision based on "nothing more than a simple disagreement" between the District and parents. *Troxel*, 530 U.S. at 60; *see also* Pl. Mem. 33. And until the District shoulders that burden, its views on herd immunity or transmission rates amount to nothing more than a disagreement. This brings us to the heart of the matter.

      **1.**    **This Court should reject Defendants' invitation to break new ground in substantive due process by placing children on the same legal footing as their parents when it comes to routine medical decisions.**

Though they never come out and say it directly, one cannot help but think that if a "mature minor" and his or her parents were to come into conflict—a conflict the Act fans into flame—the District would side with the minor's decision over the parents. And there is no question the Act would do so. A closer look at the facts of *Bonner* provide some important rejoinders, and offers a sobering reminder of why the law affords special protection to the decisions of fit parents—and why removing the "safety net" of parents from their "mature minors" is so fraught with peril. In *Bonner*, a fifteen year old child was persuaded by his aunt to engage in a series of skin grafts for his cousin. *Bonner*, 126 F.2d at 121. The ordeal, which ultimately proved unsuccessful, lasted two months and left the boy in considerable pain. The boy's actions were no doubt commendable: "the operation was entirely for the benefit of another and involved sacrifice on the part of the infant." *Id.* at 123. But that didn't change the fact that

the procedure caused him "serious physical pain" "involving anesthesia, blood-letting, and the removal of skin from his body, with at least some permanent marks of disfigurement." *Id.* Such a procedure "require[d] a mature mind to understand precisely what the donor was offering to give." *Id.*

Because there was no threat to the child's life or limb, *Bonner* held that "[t]he circumstances in the instant case are wholly without the compass of any of these exceptions," and the "the court below should, in the circumstances we have outlined, have instructed that the consent of the parent was necessary." *Id.* It failed to do so, and that failure was reversible error. Nor was this an anomalous approach—the Tenth Circuit did the same thing in *PJ*. After concluding that the general right of parents to direct the care of their children included "a more specific right to make decisions about the child's medical care," *PJ,* 603 F.3d at 1197, the court engaged in the same balancing of interests as the D.C. Circuit did in *Bonner*: "when a child's life or health is endangered by her parents' decisions, in some circumstances a state may intervene without violating the parents' constitutional rights*." Id.* at 1198 (emphasis added). *Bonner* distinguished another case Defendants cite—*Bakker v. Welsh*, 144 Mich. 632 (1906)— for the same reason. *See* Def. Mem. 28 (citing Bakker as a case where the court "reject[ed] liability of medical providers for failure to obtain parental consent where a 'young fellow almost grown into manhood' sought surgery"). *Bonner* rejected the Defendant's invitation to follow *Bakker*, which involved a boy who "was 17 years old," was "accompanied to the surgeon's office by his aunt and two sisters, all adults," and—critically—where "it did not appear that the father would have refused his consent." *Bonner*, 126 F.2d at 123. The *Bakker* Court—in a ruling that predated parental rights cases like *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)—did refuse to hold the physician liable for the surgery. But it was not because the patient was a "mature minor." Rather, the Court noted that the young

man not only went to the physician with his adult aunt and sisters, but that he went "back to his father with an agreement." *Bakker*, 144 Mich. at 635. There was "nothing in the record to suggest that, if the consent of the father had been asked, it would not have been given"; indeed, "there is nothing in the record to indicate to the doctors, before entering upon the operation, that the father did not approve of his son's going with his aunt and adult sisters, and consulting a physician as to his ailment, and following his advice." *Id.* at 635-636.

And as the D.C. Circuit noted in *Bonner*, the Michigan Supreme Court declined to follow *Bakker* in a subsequent case where the child's "parents had repeatedly indicated that they did not want the boy's tonsils removed," and "neither of his parents were with him at the time of the operation, or came to the hospital with him." *Zoski v. Gaines*, 271 Mich. 1, 10 (1935). To "allow consent to be implied in such situations" would "go far beyond the law as laid down in the authorities cited and examined." *Id.*

In truth, the Defendant's arguments are no different from those advanced—and rejected—in *Parham v. J.R.* There, the state tried to argue that the decision of parents to have a child admitted to a mental hospital "must be subjected to an exacting constitutional scrutiny, including a formal, adversary, pre-admission hearing." *Parham*, 442 U.S. at 603. That argument swept too broadly. "Simply because the decision of a parent is not agreeable to a child or because it involves risks," the Supreme Court held, "does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." Indeed, "[t]he same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure," none of which the Court would have found sufficient to override the parents' choice. *Id.*

Certainly, children may hold views that are different from their parents. But that does not change the fact that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Id.*

That is why "[p]arents can and must make those judgments." *Id.* The outcomes of *Meyer v. Nebraska* and *Pierce v. Society of Sisters* would not have been different "if the children there had announced a preference to learn only English or a preference to go to a public, rather than a church, school." *Id.* at 603-604. The same is true of medical decisions: "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Id.* at 604.

The lesson is clear: as a general rule, parental consent is needed for medical treatment; and while there are some narrow exceptions to that rule, they arise only in cases of necessity, where the child's life or health are threatened. In all other cases—including cases involving "mature minors"—parents have a fundamental right not only to "control," but to "direct" the care of their children. They direct that care when children are infants by making all decisions for them, not just the medical ones. As children grow and develop, the role of parents changes. But until the child becomes an adult, parents continue to provide critical direction to their children.

To direct a child—especially a "mature" child—a parent must know what the child is going through, and must have a voice in the conversations the child is having. The changes the nature of that conversation: Your parents don't know what's best—in fact, they're putting you at risk. You know better. And you don't have to stand for it anymore. And then it does its best to cut parents out that conversation entirely.

### 2. The Minor Consent Act does not give special weight to the decisions of fit parents, does not further a compelling interest, and is not narrowly tailored.

Medical decisions are among the most private of family decisions, and "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530

U.S. at 68-69. For this reason, "[s]ubstantial governmental burdens on family integrity are subject to strict scrutiny review, and they survive only if the burden is narrowly tailored to serve a compelling state interest." *De Nolasco v. United States Immigration & Customs Enforcement*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018).

The Defendants assert a "compelling interest in stemming the spread of deadly communicable diseases." Def. Mem. 25. As we pointed out previously, the problem with this argument is two-fold. First, the leading case cited by the Defendants held that "[s]temming the spread of *COVID-19* is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020) (emphasis added). But the Act is not a pandemic measure. At the time the Act was drafted and passed, the list of vaccines that could be administered did *not* include the vaccine for COVID-19. And nothing in the Act references pandemics generally, or the COVID-19 pandemic specifically. *See* Pl. Mem. 25.

Second, the "compelling interest" put forth by the District is far too broad. One can acknowledge that "the state's wish to prevent the spread of communicable diseases" is a compelling interest. But unless the District *also* proves that it has a compelling interest in applying the Act *to the particular plaintiffs*, it "cannot rely on its generalized interests in protecting public health or combating the COVID-19 pandemic, critical though they may be." *See* Pl. Mem. 21-22, *quoting Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 298 (D.D.C. 2020); *see also* Pl. Mem. 25, *quoting Franz*, 707 F.2d at 607 (requiring the government to "promote, *in a particular case*, compelling governmental interests" before it infringes on fundamental rights) (emphasis added).

**III.    Absent relief from this Court, the Plaintiffs will continue to suffer irreparable, imminent, and redressable injuries.**

Defendants' objection to the issuance of a preliminary injunction argues that "Plaintiffs will not suffer irreparable harm . . . because they have not shown they are likely to suffer any injury," Def. Mem. 42, is subject to the same defects as their arguments on standing. Plaintiffs have detailed the harm they continue to suffer in nearly 175 paragraphs of the First-Amended Complaint. The psychological pressure on impressionable young minds, the clandestine nature of the program, and the offense to parental and religious rights are all forcing a wedge between parents and children. These damages will be long-lasting and irreparable.

The Act has already injured the Plaintiffs by subverting their lawful exemptions; it continues to do that even now; the Plaintiffs' children have and will continue to face immense pressure to violate their parents' wishes in the crucible of public high schools; and DC Health is operating vaccine clinics in DCPS schools, including schools where the Plaintiffs' children are enrolled.

"It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Those losses have occurred and are occurring. And as we argued in our prior memorandum, the injuries feared in *Mills* were arguably less imminent than the injuries the Plaintiffs feared when they filed their complaint. *See* Pl. Mem. 36-37. The plaintiffs in *Mills* had a temporary reprieve from NSZ checkpoints; the Act is currently on the books. The plaintiffs in *Mills* did not know when the District would resume the checkpoints; the plaintiffs know DCPS and DC Health are operating clinics, and when they will threaten their children (August 30th). Pl. Mem. 37-39. Those threats are even more imminent now that at least two clinics are in Plaintiffs' schools.

Finally, the Defendants make objections rooted in generalized concerns about public health. Def. Mem. 44. They invoke the community's "right to protect itself," but offer no explanation for why restoring the religious exemptions that the District created, and which the Plaintiffs had before the Act was adopted, would put the community at risk. In contrast, the burden on the Plaintiffs' rights is severe and ongoing.

As this Court held in Capitol Hill Baptist, "[w]hile the public clearly has an interest in controlling the spread of disease, the public also has an interest in honoring protections for religious freedom in accordance with the laws passed by Congress." *Capitol Hill Baptist Church*, 496 F. Supp. at 302-303. Where "the government has failed to show a compelling interest" in applying a law to the Plaintiffs, "the public has little interest in the 'uniform application' of the regulations. The public interest instead weighs in favor of the Plaintiffs." *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 130 (D.D.C. 2012).

RFRA covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment." Pl. Mem. 32, *quoting Capitol Hill Baptist Church*, 496 F. Supp. 3d at 301 and *Tyndale House Publishers*, 904 F. Supp. 2d at 129.

The Defendants extensively cite the Third Circuit's 2007 decision in *Anspach v. City of Philadelphia* for the proposition that these rights can only be violated "in cases where the government 'compelled interference in the parent-child relationship.'" Def. Mem. 28. There is no violation here, they contend, because the Act "is permissive and does not compel, coerce, or prohibit any action." *Id.* at 29. This is incorrect.

The Defendants' discussion of *Anspach* is lengthy, Def. Mem. 28-30, but omits some crucial details. The Third Circuit relied heavily on the fact that the public health center "had no authority over Melissa, nor did Center staff become involved in [the child's] reproductive health decisions without invitation." *Anspach*, 503 F.3d at 266. The Court noted that a public health

clinic was "a facility that, *unlike a public school*, does not require attendance or exercise authority over its visitors." *Id.* at 271 (emphasis added). That distinguished the dispute in *Anspach* from those in cases like *Lee v. Wiseman*, where the Supreme Court found that "circumstances endemic to a high school graduation" created a sense of compulsion, which "coerced those attending to join in the prayer whether or not doing so violated their personal religious beliefs." *Anspach*, 503 F.3d at 264. As *Wiseman* held (in a passage *Anspach* quoted):

> The *undeniable fact* is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the Invocation and Benediction. This pressure, though subtle and indirect, can be *as real as any overt compulsion*. . . . [F]or the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, *the injury is . . . real*.

*Anspach*, 503 F.3d at 264, *quoting Lee v. Wiseman*, 505 U.S. at 592-93 (emphasis added, ellipses in *Anspach*).

The Defendants do their best to restrict the Act's reach just to clinics and medical providers.[3] But its application there has no bearing on the standing of the parents here, whose children are subjected to the Act in the very place *Anspach* distinguished: public schools.[4]

The Defendants are largely dismissive of the fact that Plaintiffs' children have faced "intense peer pressure" to receive vaccines, because the Plaintiffs "do not allege this pressure

---

[3]  *See, e.g.*, Def. Mem. 9 (arguing that Plaintiffs' "alleged injuries" "depend upon pure speculation" that "a *medical provider* would find the children capable of providing informed consent"); *id.* at 11 (the Act allows "*healthcare providers*" to provide a service under certain circumstances"); *id.* at 12 ("the Act does not prohibit *providers* from recording certain information in patients' medical records," make it "impossible for *providers* to report adverse events resulting from those vaccines," or prevent *providers* from "sharing the federally developed VIS's"); *id.* at 21 (the Act "directs *healthcare providers* to leave blank one section of a District-only form used exclusively by District schools and daycare providers"); *id.* at 22 ("the Act's directive with respect to a District-only school immunization form has no bearing on the *medical provider*'s ability to report an adverse event to federal authorities").

[4]  *Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980), also cited by Defendants, similarly involved a publicly operated family planning clinic, not a program in public schools.

came from District employees or officials," Def. Mem. 11, and in any event, "Plaintiffs' children have not been persuaded in the past seven months to seek out the vaccine as a result" of this "intense peer pressure." *Id.* at 5. This misses the point. Whether or not a school-age child *actually succumbs* to peer pressure doesn't mean the child hasn't felt coerced by that pressure. As *Wiseman* noted, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Wiseman*, 505 U.S. at 592. While adults may be able to appreciate the distinction between rising as a sign of "simple respect for the views of others" and rising as "an expression of participation" in an activity, the Court recognized that "for the dissenter of *high school age*, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, *the injury is no less real*." *Id.* at 593 (emphasis added).

   Placing children in such a position, and encouraging them to defy their parents' wishes, is the opposite of respect for the parent-child relationship. While the government undoubtedly has an "interest in the welfare of children," children also have an "interest in . . . the lawfully exercised authority of their parents." *Calabretta*, 189 F.3d at 820. That authority is subverted when the state overrides the decisions of parents. "There is not much reason to be concerned with the privacy and dignity of the three year old whose buttocks were exposed," the Ninth Circuit observed. "But there is a very substantial interest, which forcing the mother to pull the child's pants down invaded, in the mother's dignity and authority in relation to her own children in her own home." *Id.* at 820. "An essential aspect of the privacy of the home is the parent's and the child's interest in the privacy of their relationship with each other," and the same is true of the "children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents." *Id.*

Here, each of the parents has exercised their lawful authority to claim a religious exemption. Therefore, the government's only legitimate role is to protect the affected children's interest in the lawfully exercised authority of their parents. "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents *rather than the state*." *Wallis ex. rel. Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 1999) (emphasis added). Parents should be able to send their children to school with confidence, knowing that the lawful choices they have made on behalf of their children will not just be respected by the government, but that the government will protect their *children's interests* in the lawfully exercised authority of their parents. The Act does just the opposite, depriving both children and their parents of constitutional and statutory rights. This, in and of itself, is a past, current, and ongoing injury.

**IV.   The balance of interests favors the Plaintiffs. The Minor Consent Act should be enjoined.**

The Defendants offer generalized concerns about herd immunity and the transmission rate of various diseases. Those concerns may be true. But it is also true that those concerns are not great enough to cause the District to *mandate* the COVID-19 vaccine for all school-age children ages 12 and up. That being so, it is difficult to see how the same generalized concerns would be strong enough to justify interfering with the exemptions of parents who object to vaccines for religious reasons—and are lawfully allowed to exempt their children based on those beliefs.

**A.  Plaintiffs successfully pled Subject Matter Jurisdiction.**

"[S]ubject matter jurisdiction is, of necessity, the first issue for an Article III court." *Loughlin v. United States*, 393 F.3d at 170.

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201 et.

seq. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. Defendants are residents of

the District of Columbia; Defendant Muriel Bowser is mayor of the District. FAC ¶¶ 8-9.

### B. Plaintiffs successfully State Claims upon which Relief may be Granted.

The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. at 678. "Federal Rule of Civil

Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader

is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the

grounds upon which it rests.' " *Bell Atl. Corp v. Twombly*, 550 U.S. at 555 (citing *Conley v.*

*Gibson*, 355 U.S. at 47). Furthermore, the allegations of the complaint must be taken as true.

*Jenkins v. McKeithen*, 395 U.S. at 421-22. "In passing on a motion to dismiss . . . for failure to

state a cause of action, the allegations of the complaint should be construed favorably to the

pleader." *Scheuer v. Rhodes*, 416 U.S. at 236.

Plaintiff's verified First-Amended Complaint details the harm, the pressure, and the

psychological damage they have suffered constitute violations of 28 U.S.C. § 2201 and 42

U.S.C. § 1983 NCVICA and the Fifth Amendment (1st COA), 28 U.S.C. § 2201, 42 U.S.C

§ 1983 and 42 U.S.C. § 2000bb unconstitutional violation of RFRA (2nd COA), 42 U.S.C. § 1983

unconstitutional violation (3rd COA) and 28 U.S.C. § 2201 and 42 U.S.C. § 1983 a violation of

the Fifth Amendment (4th COA).  FAC ¶¶ 370-410.

### C. Plaintiffs are entitled to the issuance of a Preliminary Injunction.

"A Plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555

U.S. at 20 (emphasis added).  The last two factors merge when the government opposes an

injunction. *Nken v. Holder*, 556 U.S. at 435. A Plaintiff bears the burden of proving all four prongs of the standard before relief can be granted. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d at 1292. *See also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 297 (movant must demonstrate "by a clear showing" that the requested emergency relief is warranted).

**Success on the Merits** – based on the allegations contained in their verified First-Amended Complaint, and the violations of various laws as pled in the four causes of action, Plaintiffs show a likelihood of success on the merits – even at this early stage of the controversy and before discovery has taken place. Defendants' unlawful program offends every notion of common sense responsibility.

**Irreparable Harm** – Plaintiffs have detailed the harm they continue to suffer in nearly 175 paragraphs of the First-Amended Complaint. The psychological pressure on impressionable young minds, the clandestine nature of the program, the offense to home and parental, religious rights is forcing a wedge between parent and child. These damages will be long lasting and irreparable.

**Balance of the Hardships** - The District has nothing to gain by allowing minors to act as adults and even defy their parents. Losing their rights under the Act, will not impose a hardship other than a loss of 'brownie points' for Defendants.

On the other hand, the irreparable harm the children will continue to suffer is a tremendous hardship to their young psyches.

**Public Interest** – Lying by public officials regarding safety and efficacy, keeping secret vaccine records secret, while pretending they are doing the residents a favor is nothing more than politics as usual and can never be in the public interest.

The threat to school children of the vaccine greatly outweighs any benefit that could be gained. With long-term safety completely unknown, luring children to be injected with an experimental compound, by offering gifts and chances to win scholarships is reprehensible.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for preliminary injunction should be granted. In the alternative, the Plaintiffs should be permitted to amend their complaint.

Respectfully submitted this 28 day of January 2022:

/sRolf G. S. Hazlehurst
Rolf G. S. Hazlehurst
Robert F. Kennedy, Jr.
Children's Health Defense
202 Tuckahoe Cove
Jackson, TN 38305
731-267-1663
E-mail: rolf.hazlehurst@childrenshealthdefense.org
*Counsel for Plaintiffs*

James R. Mason III
D.C. Bar No. 978781
Darren A. Jones
Peter K. Kamakawiwoole, Jr.
Parental Rights Foundation
One Patrick Henry Circle
Purcellville, VA 20132
Phone: (540) 338-5600
Fax: (540) 338-1952
E-mail: jim@hslda.org
*Counsel for Plaintiffs*