## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **VICTOR M. BOOTH,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 21-01857 (TNM)** |
| **MURIEL BOWSER,** *et al.*, | |
| **Defendants.** | |

## <u>DEFENDANTS' REPLY IN SUPPORT OF</u>
## <u>MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

    I.   Plaintiffs Have Failed To Demonstrate Standing. ..................................................... 3

    II.   Plaintiffs Fail To Show a Conflict With, or Violation of, the National Childhood
Vaccine Injury Act. ............................................................................................................ 8

    III.    Plaintiffs Fail To Show Any Infringement of a Fundamental Right............................ 10

    IV.    Plaintiffs Fail To State a RFRA Claim Because the Act Does Not
Substantially Burden Their Religious Exercise. ...................................................................... 16

    V.   Plaintiffs Fail To State a Free Exercise Claim Because the Act Is Neutral and
Generally Applicable.............................................................................................................. 18

    V.   The Act is Narrowly Tailored and Serves a Compelling Governmental Interest. ............. 19

CONCLUSION..................................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Alabama Ass'n of Realtors v. United States Dep't of Health & Human Servs.*,
   539 F. Supp. 3d 29 (D.D.C. 2021)............................................................................. 9

*\*Anspach v. City of Philadelphia*,
   503 F.3d 256 (3d Cir. 2007) .................................................................. 13, 15, 16

*\*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
   281 F. Supp. 3d 88 (D.D.C. 2017)............................................................................ 16

*Bonner v. Moran*,
   126 F.2d 121 (D.C. Cir. 1941).................................................................................. 14

*\*Bragdon v. Abbott*,
   524 U.S. 624 (1998) ............................................................................................... 9

*Chevron U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984) ............................................................................................... 9

*Connecticut Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ............................................................................................. 10

*Daniels v. Williams*,
   474 U.S. 327 (1986) ............................................................................................. 13

*Davis v. Michigan Dep't of Treasury*,
   489 U.S. 803 (1989) ............................................................................................. 10

*Doe v. Irwin*,
   615 F.2d 1162 (6th Cir. 1980) .............................................................................. 16

*Eagle Pharm., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ........................................................ 10
*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ...................................................................... 10
*Fernandez v. Mukasey*,
  520 F.3d 965 (9th Cir. 2008) .......................................................... 18
*Fields v. Palmdale Sch. Dist.*,
  427 F.3d 1197 (9th Cir. 2005) ........................................................ 12
*J.R. v. Lehigh County*,
  534 Fed. App'x 104 (3d Cir. 2013) ................................................. 16
*\*Jackson v. Peekskill City Sch. Dist.*,
  106 F. Supp. 3d 420 (S.D.N.Y. 2015) ............................................. 16
*\*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ........................................................................ 11
*Kaemmerling v. Lappin*,
  553 F.3d 669 (D.C. Cir. 2008) ................................................. 17, 18
*Kaufman v. Nielsen*,
  896 F.3d 475 (D.C. Cir. 2018) .......................................................... 9
*\*Lee v. Weisman*,
  505 U.S. 577 (1992) .............................................................. 3, 6, 7
*Love v. Riverhead Central Sch. Dist.*,
  823 F. Supp. 2d 193 (E.D.N.Y. 2011) ............................................ 13
*McCurdy v. Dodd*,
  352 F.3d 820 (3d Cir. 2003) ..................................................... 12, 13
*Navajo Nation v. U.S. Forest Serv.*,
  535 F.3d 1058 (9th Cir. 2008) ........................................................ 16
*New York v. Ferber*,
  458 U.S. 747 (1982) ...................................................................... 20
*Newdow v. Rio Linda Union School Dist.*,
  597 F.3d 1007 (9th Cir. 2010) .......................................................... 6
*Parents for Privacy v. Barr*,
  949 F.3d 1210 (9th Cir. 2020) ........................................................ 12
*Parham v. J.R.*,
  442 U.S. 584 (1979) ...................................................................... 12
*\*Planned Parenthood of Central Missouri v. Danforth*,
  428 U.S. 52 (1976) .................................................................. 17, 19
*\*Prince v. Massachusetts*,
  321 U.S. 158 (1944) ................................................................. 16, 18
*Pritchard v. Florida H.S. Athletic Ass'n, Inc.*,
  2020 WL 2838852 (M.D. Fla. June 1, 2020) ................................... 17
*Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*,
  867 F.3d 338 (3d Cir. 2017) ........................................................... 18
*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S.Ct. 63 (2020) ....................................................................... 19
*Rubin v. United States*,
  449 U.S. 424 (1981) ...................................................................... 10

*Russ v. Watts*,
    414 F.3d 783 (7th Cir. 2005) ............................................................................ 13

*Santa Fe Indep. Sch. Dist. v. Doe*,
    530 U.S. 290 (2000) ......................................................................................... 6

*Seamons v. Snow*,
    84 F.3d 1226 (10th Cir. 1996) .......................................................................... 17

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ......................................................................................... 17

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ......................................................................................... 10

*\*Spokeo, Inc. v. Robins*,
    578 U.S. 136 S. Ct. 1540 (2016) ................................................................. 4, 5

*Tandem v. Newsom*,
    141 S. Ct. 1294, 209 L. Ed. 2d 355 (2021) ...................................................... 19

*Troxel v. Granville*,
    530 U.S. 57 (2000) .............................................................................. 11, 12, 13

*U.S. Postal Service v. Gregory*,
    534 U.S. 1 (2001) ............................................................................................. 6

*United States v. Armstrong*,
    517 U.S. 456 (1996) ......................................................................................... 6

*United States v. Mead*,
    533 U.S. 218 (2001) ......................................................................................... 9

*Valdivieso Ortiz v. Burgos*,
    807 F.2d 6 (1st Cir. 1986) ................................................................................ 13

*Van Emrik v. Chemung County Dep't of Social Servs.*,
    911 F.2d 863 (2d Cir. 1990) ....................................................................... 14, 15

*Williamson v. Nettleton Sch. Dist.*,
    2021 WL 3698395 (N.D. Miss. Aug. 19, 2021) ................................................ 17

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ......................................................................................... 14

**Statutes**

42 U.S.C. § 300aa-25(a) ...................................................................................... 9
42 U.S.C. § 300aa-25(a)–(b) ................................................................................. 9
42 U.S.C. §§ 264(a) ............................................................................................. 9
D.C. Code § 38-506 ............................................................................................. 4
D.C. Code § 38-602(a)(2) ..................................................................................... 12
D.C. Code § 38-506(2) ......................................................................................... 19

**Regulations**

22-B DCMR § 600, 600.9 ...................................................................................... 6
22-B DCMR § 600.7(b), (c) ................................................................................... 11

## INTRODUCTION

In opposing defendants'[1] motion to dismiss, plaintiffs present no new arguments or authorities and fail to distinguish the District's controlling and persuasive cases, again simply asserting that the challenged Act is not passive but "active," affirmatively depriving plaintiffs of their rights. Again, plaintiffs are incorrect.

As a threshold matter, plaintiffs again fail to offer a single case in support of their standing argument that actually discusses the standing doctrine, or to otherwise contradict the arguments put forth by the District that they face no certainly impending injury. They rely, primarily, on an argument that the *existence* of available vaccines within some public schools suffices to establish standing, despite clear guidance from this Court to the contrary when it dismissed plaintiffs' initial complaint. Plaintiffs' Amended Complaint [31] cures nothing and should be dismissed for the same reason as their first—indeed, the passage of time and the continued absence of any allegations the Court has said might establish standing reinforces the conclusion that plaintiffs face no certainly impending injury.

Even if the Court finds this time that plaintiffs have shown they face certainly impending injury, plaintiffs' Amended Complaint should be dismissed for failure to state a claim.

Plaintiffs fail to state a claim for violation of due process. Nobody is seeking to usurp the traditional role of parents in determining their children's medical care. But, as *amici* point out, in rare circumstances parental involvement is impossible or harmful, or the "parents may oppose medical care that is necessary to protect their child's health." Brief of *Amici Curiae* American Academy of Pediatrics, *et al.*, [38] at 18–19. The passive Act and the mature minor doctrine

---

[1]    Defendants are Muriel Bowser, LaQuandra Nesbitt, and Lewis Ferebee (sued in their official capacities only) (collectively, the District).

generally arose to address these situations. The mature minor doctrine has been recognized in the common law in all states for more than a century. And many States—like the District—have enacted a variety of laws based on that doctrine to allow minors, in some circumstances, to obtain health care without their parents' knowledge or consent. Once more, plaintiffs fail to cite any case from any jurisdiction invalidating on constitutional grounds a law like the District's. They attempt to turn this case on its head, asserting that it is the District that is attempting to "break new ground in substantive due process." Pls.' Opp. [39] at 41.[2] Not so. The recognized constitutional rights of parents and children are evident, and it is plaintiffs who attempt—unsuccessfully—to blur distinctions that have been clear for years, in a vain effort to create new doctrine. To the extent plaintiffs continue to assert that the Act is an unprecedented infringement on fundamental constitutional rights, they remain mistaken.

As to the National Childhood Vaccine Injury Act of 1986 (the NCVIA), plaintiffs merely repeat their incorrect legal conclusions, asserting that the Act is preempted, but again failing to explain *how*, in any way that accords with the plain statutory language of the federal law. As the District has shown, the NCVIA has been in place for more than 40 years and its provisions have been cited (and challenged) in hundreds of decisions. If the Act's provisions make it "impossible" for healthcare providers to comply with the NCVIA, there would be *some* relevant case law explaining the preemptive reach of the NCVIA as it applies to laws like the District's. Plaintiffs cite none because there is none.

Finally, plaintiffs also attempt to couch their disagreements with the Act in terms of their religious exercise. But these attempts also fail to state any claim. Plaintiffs fail to show that the

---

[2]     Page citations are to the ECF pagination.

Act's reference to the religious exemption from the student vaccine requirements—an exemption that is neither constitutionally required nor given for any comparable secular reasons—substantially burdens their exercise of religion or shows that the District acted in a non-neutral manner.

Plaintiffs' Amended Complaint should be dismissed with prejudice.

## ARGUMENT

## I.    <u>Plaintiffs Have Failed To Demonstrate Standing.</u>

Plaintiffs again devote most of the argument nominally addressed to standing in their opposition to arguments on the merits. *See* Pls.' Opp'n at 22–31; *e.g.*, *id*. at 22–26 (attempting to distinguish various cases raised in the District's arguments on the merits); *id*. at 27–31 (arguing purposes of the Act and misrepresenting plain text and history of District regulations). Plaintiffs' memorandum does not challenge or even discuss the applicable law of standing set forth in the District's memorandum. *Compare* Pls.' Opp'n at 19–32 *with* Defs.' Mem. [35] at 21–26. Indeed, their opposition has no discussion of any case that concerns standing, or which supports their standing, at all.

Nonetheless, plaintiffs' opposition appears to contain two arguments about standing:  (1) plaintiffs have already been, and are continuously, injured because the Act "subverted the parents' lawful [religious] exemptions;" and (2) the existence of the Act and certain actions by the District put "pressure" on plaintiffs' children tantamount to "'overt compulsion.'" Pls.' Opp'n at 21–22 (quoting *Lee v. Weisman*, 505 U.S. 577, 592-93 (1992)). Neither defeats the arguments put forth by the District.

Plaintiffs' first argument is essentially elaborated as follows:

[T]he District has given parents the lawful authority to exempt their children from vaccinations. … The harm [here] is not exclusively caused by a vaccination at the

> end of the 'chain of events' listed by the defendants … ; the harm has already been caused by authorizing parents to exempt their children on the one hand, then abrogating that lawful right on the other hand. That harm has already occurred, is ongoing, and will only be exacerbated at each of the steps listed by defendants.

Pls.' Opp'n at 31–32; *see also id*. at 21 (asserting the "loss" of a "statutory right" to "exempt their children from vaccine requirements"). This argument reduces to the idea that plaintiffs have been injured by a change in the law because the law has changed, and that gives them standing to argue it should be changed again. The paragraph contains no citation to any case or authority. There is no support for the implied assertion that this is a cognizable injury.

To the contrary, the Supreme Court has made clear that for an injury to confer Article III standing, it must be, among other things, "concrete," in the "usual meaning of the term," that is "'real'" and not "'abstract.'" *Spokeo, Inc. v. Robins*, 578 U.S. 856, 136 S. Ct. 1540, 1547–48 (2016) (quoting dictionary). Some "intangible harm[s]" might be cognizable injury, but there must still be a "risk of real harm." *Id*. at 1549. In *Spokeo*, plaintiff alleged that defendant Spokeo, which operates an online "people search engine," violated his rights under the federal Fair Credit Reporting Act (FCRA) when some of the search results Spokeo "gathered and disseminated" about plaintiff were incorrect. *Id*. at 1546. The Ninth Circuit found that plaintiff had standing, reasoning that "'the violation of a statutory right is usually sufficient … to confer standing.'" *id*. (quoting circuit court). But the Supreme Court reversed, holding that plaintiff could not "allege a bare procedural violation divorced from any concrete harm, and satisfy" Article III, because not all procedural violations "present any risk of material harm." *Id*. at 1546. Inaccurate reporting of an individual's zip code, for example, might violate the FCRA but "work" no "concrete harm." *Id*.

Here, plaintiffs do not even allege that the Act violates "the lawful authority" the District has given them "to exempt their children from vaccinations," nor could they, because it does not. Pls.' Opp'n at 31–32. Plaintiffs rely upon D.C. Code § 38-506 as establishing a statutory right to

religious exemption. *Id*. at 9. That statute provides that "[n]o certification of immunization shall be required for the admission to school of a student: (1) For whom the responsible person objects in good faith and in writing, … that immunization would violate his or her religious beliefs … ." The Act does not in any way affect the conduct regulated by that statute, *i.e.*, whether a particular student is required to present a certification of immunization to attend school. If plaintiffs have submitted requests for exemption from this certification requirement, as alleged, and those requests were accepted, (and they were, *see* Pl.'s Opp'n at 9; [33-1] at 12) the passage of the Act changes nothing. Plaintiffs' children are still exempt. The "authority" to exempt children from a certification requirement does not confer any "authority" to prevent one's children from receiving vaccinations.

If the plaintiff in *Spokeo* did not have standing to proceed even where he had properly alleged a violation of a federal statutory right, it is hard to see how plaintiffs here could have standing without even that. *See* 136 S. Ct. 1540.

Plaintiffs' second argument fares no better. Citing allegations related to the District's safety protocols for unvaccinated students, and efforts to enable District residents' school-age children to receive vaccines, including by making them available inside public schools, they argue these efforts are tantamount to coercion or "compulsion." Pls.' Opp'n at 9–11, 19–22. They point to allegations that District officials have been "stressing the importance of being vaccinated;" updated public schools' "immunization policy with an increased focus on 'identify[ing] students that are non-compliant;'" "disseminat[ed] information about 'the critical public health need for immunization;'" and set up vaccination clinics inside multiple public schools, including at two schools where plaintiffs' children are enrolled. *Id*. at 19–21. Plaintiffs are essentially asking the Court to infer that District employees in public schools are going to override the will of plaintiffs'

children and force them to get the vaccines. Plaintiffs are thus also asking the Court to infer that District employees will break the law; such actions would run contrary to the Act because it only permits vaccination of mature minors when they are capable of giving, and in fact give, informed consent. 22-B DCMR § 600, 600.9. Based on the allegations presented, and in light of the general presumption of government regularity, this inference is not plausible and provides no basis to believe plaintiffs' alleged injuries are certainly impending. *E.g.*, *U.S. Postal Service v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies … ."); *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

Plaintiffs' likening the permissive Act to the affirmative government actions at issue in *Lee v. Weisman*, 505 U.S. 577 (1992), Pls.' Opp'n at 10–11, again, should be rejected out of hand. The Supreme Court in that case found unconstitutional an invocation and benediction prayer delivered by a rabbi during a high school graduation. 505 U.S. at 580. The Court held that the prayer failed the "coercion test" because, while attendance at the event was voluntary, participation in an event as important as graduation was in a "fair and real sense obligatory." *Id*. at 586. The students were indirectly (and unconstitutionally) coerced to participate in a religious exercise. *Id*. at 593. But this "indirect coercion" test is inapplicable *here* because it is only appropriately applied in the context of Establishment Clause challenges. "The Court in *Lee* … expressly confined its holding to religious exercises." *Newdow v. Rio Linda Union School Dist.*, 597 F.3d 1007, 1039 (9th Cir. 2010) (quoting *Lee*, 505 U.S. at 599 ("The sole question presented is whether a religious exercise may be conducted at a graduation ceremony … .")); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000) (applying coercion test to invalidate school prayer before high-school football games).

Moreover, in response to plaintiffs' prior attempt to rely on materially similar allegations and *Weisman*, this Court has expressly explained why *Weisman* does not control and these allegations do not suffice. [29], Motions Hr'g Tr. 4:2–7:11 (Sept. 2, 2021). It stated:

> [T]he *Weisman* case, as I recall, it's talking about a convocation of some sort … something where all the students are going. That strikes me as a more extreme version of what we have here.
>
> As I'm imagining it, you know, there's the school nurse's office or something that people wouldn't normally be going to but is available to them. So there's a convenience here to the students, but I'm not sure that I see the coercive nature that we saw at play in *Weisman*.
>
> I think it would be similar, perhaps, if the school required everyone to visit the clinic, or if these vaccines providers were going around and talking to each class and telling them that they should get vaccinated, maybe that would be the case. Plaintiffs cite no other case in support of their novel coercion theory.

*Id*. 5:21–6:9 (quote); 4:2–7:11. In response, plaintiffs' counsel explained that plaintiffs could not allege "that any of our children have been approached … until school actually started," then requested time to develop and amend the complaint "to add those kind of factual allegations." *Id*. at 6:13-7:2. Plaintiffs also later expressed some certainty that, once school began, "[d]uring the custodial time that the children are in the school, there are going to be people encouraging them to get vaccinations." *Id*. at 11:13–12:11. Despite this clear guidance and understanding, the Amended Complaint contains no such new allegations—no suggestion that any of plaintiffs' children have been directly approached or encouraged by District officials to obtain vaccines—and plaintiffs' opposition cites no other cases for the proposition that the mere existence of available vaccine clinics, and websites about them, suffices to show certainly impending injury. *See* Pls.' Opp'n at 19–22.

Finally, even if it were possible to understand the District's efforts to enable provision of potentially life-saving vaccines as some sort of coercion, plaintiffs have still failed to allege

sufficient facts to show that their injuries are "certainly impending." *See* Defs.' Mem. at 22–23. As explained in the District's memorandum, plaintiffs' alleged injuries turn upon a dependent series of uncertain things coming to be true, and the actions of third parties:  plaintiffs' children must seek out vaccination; a medical provider must determine that the children are in fact capable of providing informed consent; and, after having heard the risks and benefits of vaccinations, and despite knowing their parents' objections and the fact of their religious exemption, plaintiffs' children must choose to go through with vaccination. If any one of these things does *not* happen, the Act has no concrete effect on plaintiffs at all. There is no injury unless *all* these things happen. Plaintiffs have failed to sufficiently allege any of these things are likely to happen, let alone all of them, such that any injury would be certainly impending. *See* Defs.' Mem. at 21–24.

For these and the reasons stated in the District's motion and memorandum, plaintiffs have failed to carry their burden to show they have standing to seek relief on any claims.

## II.     Plaintiffs Fail To Show a Conflict With, or Violation of, the National Childhood Vaccine Injury Act.

Plaintiffs fail to counter the District's arguments that there is no conflict between the Act and the NCVIA, purporting to be unclear whether "part 3 of the immunization record" that the Act requires healthcare providers to "leave blank" refers to the "permanent medical record" referenced in the NCVIA. Pls.' Opp'n at 38.

But plaintiffs have no rebuttal to the obvious—that the DC Health Universal Health Certificate has a clearly labelled "part 3," which is entitled "Immunization Information," and the first line of that form reads "Use this form to report your child's physical health to their school/child care facility." [17-3] (Exhibit B to Defs.' Mem.). Plaintiffs cannot overcome the plain language of the Act—it mandates that a healthcare provider "leave blank" only a portion of a District-exclusive form, D.C. Code § 38-602(a)(2), and has no impact at all on any information

required in a person's "permanent medical record" as referenced in the NCVIA. There is no conflict between the Act and 42 U.S.C. § 300aa-25(a).[3]

Not only is the language of the NCVIA plain, the District's reading of it is the same as that of the expert agency which administers that law, the U.S. Department of Health and Human Services. *See* Centers for Disease Control and Prevention (CDC), *VIS Frequently Asked Questions*, available at *https://www.cdc.gov/vaccines/hcp/vis/about/vis-faqs.html* (Feb. 2, 2022) ("A reasonable interpretation is that State law, and specifically the State's medical consent law, should be deferred to for purposes of defining who is a minor. For example, if an 18 year old can consent to immunization under a State's law, that 18 year old is the person who should be provided a copy of the VIS.").[4] Notably, plaintiffs never even mention the CDC in their Opposition, much less

---

[3]     Healthcare providers in the District read the Act the same way:

> The D.C. Universal Health Certificate is not a patient's permanent medical record; it is a certificate provided to D.C. schools and childcare facilities so the school or facility will be aware of their students' health concerns and can ensure that students are not exposed unnecessarily to infectious diseases …. The [Act] does not suggest in any way that providers should deviate from their typical (and statutorily required, *see* 42 U.S.C. § 300aa-25(a)–(b)) practices in recording the administration of vaccinations in patients' actual medical records and reporting any adverse events.

*See* Brief of *Amici Curiae* American Academy of Pediatrics, *et al.*, [38] at 24.

[4]     The Court should defer to the CDC's interpretation. The *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984) framework applies where "'Congress [has] delegated authority to the agency generally to make rules carrying the force of law' and 'the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Alabama Ass'n of Realtors v. United States Dep't of Health & Human Servs.*, 539 F. Supp. 3d 29, 37 (D.D.C. 2021) (quoting *United States v. Mead*, 533 U.S. 218, 226–27 (2001)). The CDC's interpretation is reasonable and the agency was given a broad grant of statutory authority to "make and enforce" regulations "to prevent the introduction, transmission, or spread of communicable diseases" and the interpretation was "clearly intended to have general applicability." *Id.* (quoting 42 U.S.C. §§ 264(a), 70.2; and *Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018)). *Cf. Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) (Even where responsibility to administer statute was divided between agencies, "we need not pause to inquire whether this causes us to withhold deference to agency interpretations under [*Chevron*]. It is enough to observe that the well-reasoned views of the agencies

address that agency's interpretation of the NCVIA. That interpretation—also based on the plain language of the law—demonstrates that the Act and the NCVIA can be read in conjunction and operate simultaneously without conflict.

The Act is not preempted by federal law.

## III.    <u>Plaintiffs Fail To Show Any Infringement of a Fundamental Right.</u>

Plaintiffs continue to argue, incorrectly, that the Act is not passive and "actively" interferes in the parent-child relationship. Pls.' Opp'n at 9, 16. Plaintiffs expend considerable effort arguing that "the *primary* purpose of the Act was to actively subvert the lawful religious exemptions the parents have claimed." *Id*. at 16 (emphasis in original). But even if that statement was correct (it is not), legislative history (or the imagined malign motives of lawmakers) cannot trump the plain language of the Act. "When the words of a statute are unambiguous … 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *See also, e.g.*, *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 338 (D.C. Cir. 2020) ("'Extrinsic materials' such as legislative history, 'have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.") (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)). "Legislative history is irrelevant to the interpretation of an unambiguous statute." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808–809 n.3 (1989)).

---

implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)).

The purpose of the Act was to give mature minors concerned about their health the ability to obtain certain services without their parent's knowledge or consent. The Act does not "override" or "subvert" anything.[5]

Plaintiffs repeatedly attempt to ignore the permissive nature of the Act, dramatically describing its "compulsory" provisions, Pls.' Opp'n at 29, but *none* of the provisions they cite apply to parents or children. The Act is permissive, allowing certain minors, in certain circumstances, to obtain medical treatment without the advanced knowledge of their parents. The Act does not affirmatively "inject" itself into or otherwise interfere with the parent-child relationship. The Supreme Court long ago determined that courts should not invalidate such laws unless they lack a "real or substantial relation [to public health] or are "beyond all question, a plain, palpable invasion of rights[.]" *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). The Act easily passes this test.

Plaintiffs argue that Supreme Court precedent "requires—as a constitutional minimum—that the state afford 'special weight' to the determinations of parents[.]" Pls.' Opp'n at 41 (citing *Troxel v. Granville*, 530 U.S. 57 (2000)). Plaintiffs continue to stretch the limited holding of *Troxel* beyond its bounds. That case discussed, generally, the recognized liberty interest in parents in the "care, custody, and control of their children," 530 U.S. at 65 (plurality op.), but in a specific context—government proceedings to terminate parental rights or remove children from custody. Those issues are simply not present here.

---

[5]     Plaintiffs also argue that the Act is the "only" provision of District law allowing mature minors to obtain healthcare services in non-emergency situations or in cases not involving "heightened constitutional protections related to reproductive rights." Pls.' Opp'n at 27. This is not true. *See* 22-B DCMR § 600.7(b), (c) ("A minor of any age may consent to health services" related to "substance abuse" and "a mental or emotional condition"). But even if that were true, plaintiffs cite no cases purporting to establish any limits on the mature minor doctrine on these bases. The constitutional rights of children exist outside of emergencies and reproductive health.

In *Troxel*, the Supreme affirmed the invalidation of a "breathtakingly broad" state law that authorized "any person" to petition a court for child visitation rights "at any time," which effectively permitted "any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." *Id*. at 67. *That*, said the Supreme Court, violated the Constitution because the law placed the "best-interest determination solely in the hands of the judge." *Id*. "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id*. at 72–73.

Here, as shown, there is no "infringement" on any right of parents; the Act is permissive and operates only if a mature minor seeks treatment. The District is not seeking to "inject itself into the private realm of the family[.]" *Id*. at 68. *Troxel* simply cannot carry the weight plaintiffs place on it. "[A]lthough the Supreme Court 'recognized that parents' liberty interest in the custody, care, and nurture of their children resides 'first' in the parents, [it] does not reside there exclusively, nor is it 'beyond regulation [by the state] in the public interest.'" *Parents for Privacy v. Barr*, 949 F.3d 1210, 1231 (9th Cir. 2020) (quoting *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 16 (1944))); *see also*, *e.g.*, *Parham v. J.R.*, 442 U.S. 584, 604 (1979) ("[P]arents cannot always have absolute and unreviewable discretion to decide whether to [seek specific medical care for their children].."); *McCurdy v. Dodd*, 352 F.3d 820, 825 (3d Cir. 2003) ("[I]n § 1983 cases grounded on alleged parental liberty interests, we are venturing into the murky area of unenumerated constitutional rights.") (discussing *Troxel*)). "[T]he due process guarantee has historically been applied only to '*deliberate* decisions of government officials to deprive a person of life, liberty, or property.'" *Id*. (quoting *Daniels v.*

*Williams*, 474 U.S. 327, 331 (1986) (emphasis in original)). The Act is simply not the type of government action directed at the parent-child relationship condemned in cases like *Troxel*.

Here, because there has been no "deliberate decision" by any government actor, plaintiffs have failed to state a claim for the violation of their due process rights.

> [T]he Supreme Court has protected the parent only when the government directly acts to sever or otherwise affect his or her legal relationship with a child. The Court has never held that governmental action that affects the parental relationship only incidentally—as in this case—is susceptible to challenge for a violation of due process[.]

*Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986).

The Court should be "hesitant to extend the Due Process Clause to cover official actions that were not deliberately directed at the parent-child relationship, in disregard of the Supreme Court's admonition in *Daniels*." *McCurdy*, 352 F.3d at 829; *see also Anspach v. City of Philadelphia*, 503 F.3d 256, 262 (3d Cir. 2007) ("Courts have recognized the parental liberty interest only where the behavior of the state actor compelled interference in the parent-child relationship."). "The majority of the other Circuits that have addressed the issue have 'expressly declined to find a violation of the familial liberty interest where the state action at issue was not aimed specifically at interfering with the relationship.'" *Love v. Riverhead Central Sch. Dist.*, 823 F. Supp. 2d 193, 200 (E.D.N.Y. 2011) (quoting *Russ v. Watts*, 414 F.3d 783, 787–88 (7th Cir. 2005) (citing cases)).

Plaintiffs attempt to turn constitutional due process on its head, arguing that the District is attempting to "break new ground" in this area by purportedly placing children and parents "on the same legal footing." Pls.' Opp'n at 41. Not so. Plaintiffs fail to acknowledge or confront the longstanding reality that children themselves have constitutional rights and that mature minors have long had the ability to consent to certain medical procedures. *Planned Parenthood of Central*

*Missouri v. Danforth*, 428 U.S. 52, 74 (1976); *Bonner v. Moran*, 126 F.2d 121, 122 (D.C. Cir. 1941). Plaintiffs' attempt to force a "conflict" in this area should be rejected. Their pretense that the Act is an unprecedented assault on constitutional norms is simply false. History and tradition are firmly on the District's side here. *Cf. Prince*, 321 U.S. at 167 (The "state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare.").[6]

Plaintiffs also argue that their liberty interest includes "a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children." Pls.' Opp'n at 22 (quoting *Van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 867 (2d Cir. 1990)). But "significant" does not mean "exclusive" and, more importantly, here there are no "medical procedures" that the state is seeking to impose. Again, the Act is *permissive*, authorizing mature minors to consent to certain procedures, but requiring no affirmative action by either parents or children.

Like the other cases plaintiffs cite, they extract statements from dissimilar cases in an attempt to provide support for a non-existent rule of law. *Van Emrik* involved suspected child abuse by a baby-sitter and the temporary loss of custody by the parents while state authorities investigated. 911 F.2d at 864–66. The Second Circuit affirmed the dismissal of the parent's suit and the grant of qualified immunity to the government defendants. *Id*. at 864. The Circuit noted its "concern" at the taking of certain x-rays "made without the consent of the parents[,]" because they were "not medically indicated" and "not sought to facilitate diagnosis or treatment … but to provide investigative assistance" to the government. *Id*. at 866–67. The Second Circuit noted that such x-rays "may not be undertaken for investigative purposes at the behest of state officials unless

---

[6]     Limitations on parental rights may exist where "harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred." *Wisconsin v. Yoder*, 406 U.S. 205, 230 (1972).

a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." *Id*. at 867 (citing cases). Here, of course, there are no medical procedures being imposed by "the State" on anyone, with or without parental consent. *Van Emrik* is easily distinguished.

Similarly, plaintiffs unsuccessfully attempt to distinguish *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976), arguing that the Act itself must have some sort of "balancing" provisions within it, according deference to the parent's views. Pls.' Opp'n at 26. Plaintiffs are incorrect. The "balancing" referenced is done by a court and involves weighing the rights of the parents and the rights of the minor child. The "veto" referenced was the provision in the Missouri law allowing parental override of the minor's decision.

> [T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent. Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights."

*Danforth*, 428 U.S. at 74 (citing cases). Despite this clear, decades-old language, plaintiffs complain of the "blanket override" of their views. Pls.' Opp'n at 26. Plaintiffs fundamentally misunderstand the law.

Plaintiffs also unsuccessfully attempt to distinguish *Anspach*, arguing that its lessons do not apply here because the facility there was a public health center which the minor student sought out independently, not a public school exercising authority over its students. Pls.' Opp'n at 47–48. Plaintiffs' argument is a distinction without a difference. Advising children of the benefits and availability of vaccines, in school, is simply not the "manipulative, coercive, or restraining conduct" that infringes on parental rights. *Anspach*, 503 F.3d at 266. "[P]arents 'cannot maintain

a due process violation when the conduct complained of was devoid of any form of constraint or compulsion.'" *J.R. v. Lehigh County*, 534 Fed. App'x 104, 108 (3d Cir. 2013) (quoting *Anspach*, 503 F.3d at 264). *Cf. Jackson v. Peekskill City Sch. Dist.*, 106 F. Supp. 3d 420, 427 (S.D.N.Y. 2015) (Parents stated claim for infringement of parental liberty interest where school employees transported their daughter off campus to obtain birth control; this conduct "goes far beyond mere counseling or exposure to an idea") (distinguishing *Anspach*).

## IV.     Plaintiffs Fail To State a RFRA Claim Because the Act Does Not Substantially Burden Their Religious Exercise.

Plaintiffs fail to establish a Religious Freedom Restoration Act (RFRA) claim because they do not show that the Act substantially burdens their religious practice. Plaintiffs argue that "[c]reating an exemption for parents who have sincere religious beliefs about vaccines, and then designing a mechanism to secretly subvert the same parents who claim that exemption" constitutes a "substantial burden" under RFRA. Pls.' Opp'n at 34. But it does not. A substantial burden exists where there is an "element of compulsion." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 114 (D.D.C. 2017), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018). In other words, to sustain a RFRA claim, plaintiffs would have to show that the state is "either requiring or prohibiting" a religious exercise. *Doe v. Irwin*, 615 F.2d 1162, 1168 (6th Cir. 1980) (collecting cases); *accord, Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008). Notably, plaintiffs fail to cite any case that supports their argument that creating a *voluntary* mechanism for their minor children to violate their parents' religious beliefs creates a substantial burden under RFRA. "[T]he Constitution does not impose an affirmative obligation on [the government] to ensure that children abide by their parents' wishes, values, or religious beliefs." *Anspach*, 503 F.3d at 274.

Plaintiffs' allegation "[t]he District has recognized the legal right of parents to claim a religious exemption from vaccinations" and improperly modified that exemption is incorrect and insufficient to amount to a substantial burden under RFRA.[7] Pls.' Opp'n at 34. As the District noted in its motion, there is no Constitutional right to religious exemptions. *See* Mot. at 52–53. Plaintiffs merely identify a government benefit that may be affected by the Act, but that does not substantially burden plaintiffs' religious exercise if there is no corresponding government coercion that would force plaintiffs to choose between their religious beliefs and the government benefit. *Cf. Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding a substantial burden when obtaining unemployment benefits would require "her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand"). Plaintiffs have not identified any such coercion as a result of the Act permitting some minor children to obtain vaccines. As plaintiffs concede, "[t]he Act does not eliminate the religious exemption" and, in fact, plaintiffs have all sought and received such exemptions. Pls.' Opp'n at 34; [33-1] at 12. Thus, plaintiffs have not established a substantial burden.

In support of their substantial burden argument, plaintiffs cite to a single case: *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008). Pls.' Opp'n at 33–34. But the case does not help them; it sheds light on the inapplicability of RFRA here. In *Kammerling*, a federal prisoner

---

[7]    To the extent plaintiffs argue that the restrictions imposed on students who have invoked a religious exemption and want to participate in school sports are unconstitutional, they are incorrect. Pls.' Opp'n at 10; *See, e.g.*, *Seamons v. Snow*, 84 F.3d 1226, 1234–35 (10th Cir. 1996) (No constitutional right to participate in sports); *Williamson v. Nettleton Sch. Dist.*, Civil Action No. 20-60, 2021 WL 3698395, *3 (N.D. Miss. Aug. 19, 2021) (No constitutional right to participate in interscholastic athletics) (citing cases); *Pritchard v. Florida H.S. Athletic Ass'n, Inc.*, Civil Action No. 2:19-94-FTM-29MRM, 2020 WL 2838852, *3 (M.D. Fla. June 1, 2020) ("[T]here is no constitutional right to participate in high school athletics.") (citing cases).

sought to enjoin application of the DNA Analysis Backlog Elimination Act based on "harms arising from government possession and storage of his DNA profile, including the potential that he could become an unwilling participant in future activities that violate his religious beliefs." 553 F.3d at 678. The D.C. Circuit found that plaintiff failed to allege a substantial burden under RFRA because he "[did] not contend that any act of the government pressures him to change his behavior and violate his religion, but only seeks to require the government itself to conduct its affairs in conformance with his religion." *Id.* at 680. So too here. As in *Kammerling*, plaintiffs' argument rests on the possibility that the Act *could* permit actions they find objectionable, but plaintiffs have failed to identify any manner in which the Act requires *plaintiffs* to change *their* behavior in a way that violates their religion. *See Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 360–62 (3d Cir. 2017) (finding that "the possibility that others might avail themselves of services that the employees find objectionable" when employees had the choice of whether to participate in the objectionable program was too attenuated to constitute a substantial burden under RFRA) (emphasis in original); *Fernandez v. Mukasey*, 520 F.3d 965, 966 (9th Cir. 2008) (*per curiam*) (finding no RFRA violation when "the connection between [the statutory requirement and their religious exercise] is too attenuated to create a substantial burden on petitioners' religious exercise."). Plaintiffs have failed to allege sufficient facts to establish a substantial burden under RFRA.

## V.     Plaintiffs Fail To State a Free Exercise Claim Because the Act Is Neutral and Generally Applicable.

Plaintiffs fail to establish a Free Exercise claim because they do not show that the Act is not neutral and generally applicable. Plaintiffs argue that the Act's instruction that health care providers "leave blank part 3 of the immunization record" for minors utilizing a religious exemption is "contrary to the religious neutrality the law requires." Pls.' Opp'n at 36–37. But this

is incorrect. The Supreme Court has found that "government regulations are not neutral and generally applicable ... whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandem v. Newsom*, 141 S. Ct. 1294, 1296, 209 L. Ed. 2d 355 (2021) (emphasis in original) (*per curiam*) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67–68 (2020) (*per curiam*)). Conversely, a regulation would *not* run afoul of the Free Exercise Clause if "a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Id*. Such is the case here. Medical providers' reporting instructions under the Act apply *only* to religious exemptions because religious beliefs are the *only* basis for a non-medical exemption from vaccine requirements to attend school. There is no comparable secular vaccine exemption.[8] Plaintiffs have failed to allege any facts that could show that the Act is not neutral and generally applicable and, thus, have failed to state a claim under the Free Exercise Clause.

**V.     The Act is Narrowly Tailored and Serves a Compelling Governmental Interest.**

Even assuming the Act infringes upon a fundamental right or substantially burdened plaintiffs' religious exercise, plaintiffs are not likely to succeed on their claims because the Act is narrowly tailored to serve a compelling governmental interest.

Plaintiffs present two arguments that the District lacks a compelling interest. First, they assert that the District lacks a compelling interest because "the leading case cited" by the District for the proposition that stemming the spread of communicable disease is a compelling interest is

---

[8]     Plaintiffs' attempt to distinguish the treatment of religious exemptions from medical exemptions fails. *See* Pls.' Opp'n at 34 ("Even parents with medical exemptions are treated differently ..."). Plaintiffs merely allege that providers who administer a vaccine to a minor with a religious exemption follow a procedure that is not required of medical exemptions. But these instructions are not applicable to medical exemptions. Medical exemptions are based on the *provider's* determination that a vaccine is not medically recommended, and, therefore, providers would not be in the position of administering a vaccine under the Act. *See* D.C. Code § 38-506(2).

about COVID, and when the Act was passed, there was no COVID vaccine. Pls.' Opp'n at 45. True, the first case the District cited was about COVID, but plaintiffs inexplicably ignore the *other* cases cited by the District that speak to governments' compelling interest in stemming communicable diseases generally. *See* Defs.' Mem. at 44.

Second, plaintiffs argue that the District's stated interest in stemming the spread of communicable disease is too general to justify the burdens imposed by the Act. Pls.' Opp'n at 45. But plaintiffs again address only part of the District's arguments. The D.C. Council said the Act was needed to achieve high rates of immunization and herd immunity, which goes to the District's interest in stemming the spread of communicable disease. Defs.' Mem. at 44–45. But the Act was also "needed to grant minors, who are concerned for their health and safety, protection and the right to consent to a vaccination recommended by the U.S. Advisory Committee on Immunization Practices (ACIP)." *Id*. at 44. This goes to the District's "compelling interest" in "safeguarding the physical and psychological well-being of a minor." *New York v. Ferber*, 458 U.S. 747, 756 (1982); *see also* Defs.' Mem. at 45 (arguing Act is "aimed at minors who want to receive vaccines and are capable of providing informed consent themselves"); Brief of *Amici Curiae* American Academy of Pediatrics, *et al*., [38] at 13–18, 21–25.  Plaintiffs ignore this interest.

Relatedly, plaintiffs also argue that the Act is not narrowly tailored because the District could satisfy its compelling interests by requiring medical providers to obtain parental consent for vaccination, by newly enabling parents to participate remotely, by videoconference, or to provide consent by electronic means. Pls.' Opp'n at 35. This proposed change would not achieve the goals, or satisfy the interests, asserted through the Act. For minors whose parents do consent, it would still require the participation, time, and attention of those parents to enable their children to receive vaccinations, thus maintaining the simple logistical barrier faced by many minors, and which is

the cause of most non-vaccinations, according to evidence presented to the D.C. Council. *See* Defs.' Mem. at 29 n.5. And, for those minors whose parents refuse consent, it would still require parental consent, thus undermining the goal of the Act and entirely prohibiting mature minors, who are capable of providing informed consent, from protecting their own bodies from potentially deadly disease. Plaintiffs' proposed changes would therefore fail to satisfy the District's compelling interests in stemming the spread of disease (by enabling vaccination at scale) and safeguarding the well-being of individual minors. *See* above.

For the reasons stated, the Act is narrowly tailored to achieve compelling governmental interests.

## CONCLUSION

For the foregoing reasons, and reasons stated in the District's motion to dismiss and opposition to plaintiffs' motion for preliminary injunction, the Court should deny plaintiffs' motion and dismiss the Amended Complaint with prejudice.

Dated:  February 4, 2022.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Assistant Deputy Attorney General

*/s/ Andrew J. Saindon*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
PAMELA DISNEY [1601225]
MATEYA B. KELLEY [888219451]
Assistant Attorneys General

Equity Section
400 Sixth Street, N.W.
Suite 10100
Washington, D.C. 20001
(202) 724-6643
andy.saindon@dc.gov

*Counsel for Defendants*